THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, *v.* DALE BLEVINS, Defendant-Appellee.

First District (1st Division)   No. 81—2049

Opinion filed September 26, 1983.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Dean P. Karlos, and Larry J. Crown, Assistant State's Attorneys, of counsel), for the People.

Jody C. Weiner, of Chicago (Jeanine M. Wall and David H. Robertson, Jr., of counsel), for appellee.

JUSTICE CAMPBELL delivered the opinion of the court:

Defendant was arrested and charged by indictment with possession of a controlled substance and possession of a controlled substance with intent to deliver. (Ill. Rev. Stat. 1981, ch. 56½, par. 1401(a)(2).) After a hearing, the trial court sustained defendant's motion to quash the arrest and suppress the evidence. The State now appeals.

The issues raised on appeal are: (1) whether the police officers had reasonable suspicion to believe that defendant had concealed contraband inside his sealed manila envelope when the officers took possession of said envelope for a canine sniff; (2) whether probable cause to search defendant's manila envelope was established; and (3) whether the trial court committed reversible error in finding that defendant's consent to a search of his manila envelope was not voluntary.

We affirm. :

Officer Kozaritz testified that on March 19, 1981, at approximately 5:50 p.m., defendant arrived at O'Hare Airport on a commercial flight from Fort Lauderdale, Florida. Officer Kozaritz and his partners, Officers Abreu and Tourney, were conducting a surveillance for drug couriers arriving on flights from Fort Lauderdale and Miami, Florida. Defendant was between the 10th and 15th person to deplane. He was wearing blue jeans, cowboy boots, a tweed overcoat, and a yellow shirt. As defendant walked down the terminal, he bounced a golf ball and brushed into a few people. About 40 feet down the terminal, defendant stopped, and then looked over his shoulder. At the baggage area, defendant looked over his shoulder again and observed that his luggage had not yet arrived. Defendant then placed a phone call. Officer Kozaritz testified that he overheard defendant state that, "he was in Chicago and at O'Hare Field and that he had a surprise and that he couldn't talk, he was on a public phone." Defendant re-

trieved his large suitcase and started walking towards the exit door. The three officers, wearing plain clothes and displaying no weapons, approached defendant at the same time. Officer Kozaritz walked alongside defendant and then up to the front of him. Officer Abreu walked to the left of defendant and Officer Tourney walked to the right of defendant. Officer Kozaritz then identified himself as a Chicago police officer and asked to talk to him. Defendant responded, "sure," and placed his suitcase on the ground. Upon being asked for identification, defendant stated his name and produced his Florida driver's license which bore a photograph matching his appearance. Korzaritz testified that in reply to his inquiry, defendant, who "appeared a little nervous," stated that he was coming from Fort Lauderdale and going home to Wisconsin. Next, Officer Kozaritz informed defendant that he and his partners were seeking drug couriers from Fort Lauderdale and Miami, Florida. Defendant replied, "You got the wrong guy this time." When Officer Kozaritz then asked if he could look inside defendant's suitcase, defendant said, "Sure, why not, over there, though."

Defendant, carrying his suitcase, joined the police officers 15 to 20 feet from the exit door at an area between the escalator and east wall. Officer Kozaritz testified that he informed defendant of his right not to open the suitcase. Defendant opened the suitcase and stated that it contained clothing and medical records. Officer Abreu searched through the clothing and also removed a locked attache case from the suitcase. Officer Kozaritz then asked defendant if the police could look inside the attache case. Kozaritz testified that defendant replied, "sure," and opened the attache case. Kozaritz stated that defendant was never informed that he could refuse to unlock the attache case. Officer Abreu found three 7 x 12 inch manila envelopes inside the attache case. After feeling the outside of all three, he handed Officer Kozaritz an unmailed envelope which had a doctor's address, postage, an insured label, and the phrase "medical records" on it. According to Kozaritz, one side of the envelope felt hard and the other side felt like a pliable substance. Kozaritz testified that defendant first stated that the envelope contained medical records, but then said that they were not his medical records and that an unknown guy in Florida had given him an airline ticket and $200 to bring the envelope to Chicago. Following this conversation, Officer Abreu handed Officer Kozaritz a ledger, containing names, fractional amounts, and weights, which had been inside defendant's attache case. When asked whether he lived at the Florida address on his driver's license, defendant responded that he now lived in Wisconsin. Kozaritz testified that defendant agreed to

accompany the police officer to the Drug Enforcement Office, stating that he "would want to get this matter over with tonight."

In a room at the Drug Enforcement Agency office, Officer Kozaritz explained to defendant that the officers thought that there were narcotics in the envelope marked "medical records" and that they were going to have a customs dog sniff it. When asked if the police could look inside the envelope, defendant refused to consent. Kozaritz testified that after Officer Abreu left the room with the envelope to get a narcotics detection dog, he informed defendant that if the dog alerted to the envelope, a search warrant would be obtained. When Officer Abreu returned to the room, one side of the envelope was ripped, exposing a clear plastic bag containing a white substance. It is unclear from the record whether the envelope was torn open by the police or by the dog. Kozaritz testified that upon being informed that the dog had alerted to the envelope, defendant said, "you guys are going to get a search warrant anyhow, you can go ahead and search the envelope." Defendant then signed a consent form and the police officers opened the envelope, found contraband, and arrested defendant.

Officer Abreu corroborated the testimony of Officer Kozaritz. He testified that before defendant opened his suitcase, defendant was advised that he did not have to open his luggage. After finding the attache case inside the suitcase, the officers did not again advise defendant of his right to refuse to open his attache case.

The State first contends that the police officers had reasonable suspicion to believe that contraband was concealed inside defendant's manila envelope before the officers took possession of defendant's manila envelope for a canine sniff. The State maintains that the initial encounter between defendant and the officers was not a seizure. In the alternative, the State, relying on *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868, argues that even if the initial encounter were construed to be an investigatory stop, the officers had reasonable suspicion to believe that criminal activity was taking place at the time they approached defendant. The State maintains that the officers' reasonable suspicion was based on the following observations: defendant arrived from a source city; he walked rapidly down the corridor towards the baggage area, bumping into a few people; he bounced a golf ball; he stopped and looked over his shoulder as he walked down the corridor; he looked around the baggage area; and he placed a phone call in which he stated that he was in Chicago at O'Hare Field, had a surprise, and could not talk because he was on a public phone. Furthermore, the State contends that the contents of

defendant's locked attache case and defendant's inconsistent story regarding his manila envelope contributed to the officers' reasonable suspicion that defendant was engaged in criminal activity.

Defendant cites *People v. DeLisle* (1982), 104 Ill. App. 3d 297, 432 N.E.2d 954, in support of the contention that the investigatory stop, which constituted a seizure, was not based on specific and articulable facts warranting the officers' belief that defendant was engaged in criminal activity. In *DeLisle*, based on facts analogous to those in the case at bar, this court held that the officers did not have a reasonable suspicion to stop defendant. Defendant's characteristics of being nervous, walking rapidly from the baggage area, arriving from a source city, and possessing limited luggage failed to distinguish him from other travelers so as to justify the officers' stop. *People v. DeLisle* (1982), 104 Ill. App. 3d 297, 300, 432 N.E.2d 954, 957; see also *People v. Mills* (1983), 115 Ill. App. 3d 809, 450 N.E.2d 935.

After argument in the instant matter two other cases concerning the use of the so-called drug courier profile, airport stops and detentions, and warrantless searches of air passenger's luggage were ruled upon by the United States Supreme Court in *United States v. Place* (1983), 462 U.S. ___, 77 L. Ed. 2d 110, 103 S. Ct. 2637, and *Florida v. Royer* (1983), 460 U.S. 491, 75 L. Ed. 2d 229, 103 S. Ct. 1319.

In *United States v. Place*, when respondent's behavior aroused the suspicion of law enforcement officials as he waited in line at the Miami International Airport to purchase a ticket to New York, the officers approached respondent and requested and received identification. Respondent's flight was about to depart and his luggage was subjected to a sniff test upon his arrival in New York. Thereafter, drug agents obtained a search warrant and upon opening the suitcase discovered cocaine. Some 90 minutes had lapsed since the seizure of the luggage and the court held that under the circumstances the seizure of respondent's luggage violated the fourth amendment.

In *Florida v. Royer* the Florida Court of Appeals held that the detention of the defendant in an airport office, after State narcotics agents decided that he matched their drug courier profile, exceeded the limits of an allowable *Terry* stop. (*Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868.) The Florida court went on to hold that the defendant's subsequent consent to a search of his luggage was tainted by the illegal detention and that 65 pounds of marijuana found in his suitcase should have been suppressed as a fourth amendment violation. The United States Supreme Court agreed.

We are not constrained to prolong this initial discussion and the

second issue raised of probable cause to search defendant's manila envelope. There remains little doubt that in view of *Place* and *Royer* and the more recent cases by this court in *People v. Steckhan* (1983), 116 Ill. App. 3d 173, and *People v. Kiser* (1983), 113 Ill. App. 3d 501, 447 N.E.2d 858, wherein the facts are analogous to the facts in the instant case that the ruling and standards enunciated are controlling. In the cited cases the officers exceeded the bounds of any proper *Terry* stop and the seizures and searches were condemned. Here, the trial court found that the consent given by the defendant was obtained under duress and that there was no proof that a dog tore open the envelope. The court also indicated that there was no proof that the police officers involved were trained from experience to make an adjudication that the defendant fit the drug courier profile.

An appropriate inquiry here involves both a subjective and objective examination of whether the warrantless stop of the defendant was valid where the police officers admitted that they had no knowledge that any laws were being violated and when the officers have not specifically articulated any facts giving rise to a reasonable suspicion that a crime was being committed. The trial court by its ruling rejected the contention that a proper *Terry* stop took place accompanied by reasonable grounds of suspicion and probable cause and specifically held that the belated consent after the search of the locked attache case and the sealed manila envelope was obtained by duress and was therefore tainted and ineffective. See *Florida v. Royer; People v. Kelly* (1979), 76 Ill. App. 3d 80, 394 N.E.2d 739.

As to the propriety of a canine sniff, in *United States v. Place* the court declared:

> "*** we conclude that when an officer's observations lead him reasonably to believe that a traveler is carrying luggage that contains narcotics, the principles of *Terry* and its progeny would permit the officer to detain the luggage briefly to investigate the circumstances that aroused his suspicion, provided that the investigative detention is properly limited in scope.
>
> The purpose for which respondent's luggage was seized, of course, was to arrange its exposure to a narcotics detection dog ***.
>
> *** A 'canine sniff' by a well-trained narcotics detection dog, however, does not require opening the luggage." 462 U.S. ___, ___, 77 L. Ed. 2d 110, 120-21, 103 S. Ct. 2637, 2644.

A reviewing court will not disturb the trial court's finding on a motion to suppress unless that finding is determined to be manifestly erroneous. (*People v. Reynolds* (1983), 94 Ill. 2d 160, 445 N.E.2d 766.)

A review of the record in the instant case supports the finding that the defendant's fourth amendment rights were violated.

Accordingly, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

BUCKLEY, P.J., and McGLOON, J., concur.