THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JEROME
BELTON, Defendant-Appellant.

First District (3rd Division)  No. 1—91—2916

Opinion filed November 10, 1993.

Rita A. Fry, Public Defender, of Chicago (James N. Perlman, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Donald T. Lyman, and Hareena Meghani-Wakely, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GREIMAN delivered the opinion of the court:

Following a jury trial, defendant Jerome Belton was convicted of two counts of aggravated criminal sexual assault, one count of home invasion and one count of armed robbery. The trial court imposed two 20-year sentences of imprisonment, one for each count of aggravated criminal sexual assault, to be served consecutively. In addition, a 20-year term of imprisonment for home invasion was imposed to be served concurrently with the other sentences. No sentence was entered for armed robbery since that count merged into home invasion.

On appeal, defendant asserts that (1) the trial court erred in denying his motions to quash arrest and suppress certain evidence; and (2) his consecutive sentence should be vacated because the mandatory consecutive sentencing scheme is unconstitutional.

We affirm.

There is no dispute that on March 27, 1990, 10-year-old L.H. and her nine-year-old brother Glenn were the victims of home invasion and armed robbery. There is also no dispute that L.H. was sexually assaulted during the course of the home invasion and armed robbery. The primary issue at trial was the identity of the assailant, i.e., whether defendant was the man who committed the crimes.

At trial the State presented five witnesses: L.H., the 10-year-old victim; Glenn, the nine-year-old brother of the victim; Glenn Covington, the father of the victim and Glenn; and Richard Paladino, a detective. During their trial testimony, both L.H. and Glenn made in-court identifications of defendant. The State's witnesses testified that the following events occurred.

About 3:30 p.m. on March 27, 1990, L.H. and Glenn returned home from school. As they entered the front door of their apartment building, defendant followed them into the vestibule and asked them if a man named Berry lived there. After L.H. replied "no," defendant followed the children as they walked up the stairs to their third-floor apartment, drew a handgun, and told the children not to scream.

When they arrived on the third floor, defendant asked the chil-dren if they owned a dog and if their parents were home. The chil-

dren answered no to each question. When L.H. opened the front door to the apartment, defendant returned the gun to his pocket and entered the apartment with the children. Defendant entered the bedroom of the children's parents and took money from the dresser. Defendant then inquired if there were any guns in the apartment and found one in the closet of the parent's bedroom. Glenn told defendant there was another gun in the kitchen pantry. While in the kitchen, defendant found a starter gun and then scratched Glenn on the finger with a knife, leaving a permanent scar.

Defendant directed both children into Glenn's bedroom, where he locked Glenn in the closet. Defendant proceeded to take L.H. into the front room, unhooked the video cassette recorder (VCR), placed it in a plastic bag provided by L.H., and put it in the hallway.

Defendant then took L.H. to her parent's bedroom, told her to put her face on the pillow on the bed and lay down on her stomach. Defendant removed L.H.'s tights and panties, turned off the lights, and pulled down his pants and underwear. Defendant then "put his private parts in [L.H.'s] butt" and asked L.H. if she had "ever been fucked before." L.H. was crying and answered no. Defendant was unable to penetrate L.H.'s anus. Defendant then went to check Glenn in the closet, returned to the bedroom, slapped L.H. in the face, causing her glasses to fall off. Defendant then put his penis in L.H.'s mouth, withdrew, attempted anal sex again, and turned on the lights.

Defendant asked if there was any more money and L.H. directed him to her parent's dresser drawer. Defendant took the money from the dresser drawer, jewelry belonging to L.H.'s mother, and the children's piggy bank. Before leaving the apartment, defendant told L.H. not to scream and warned her that "we tell, he'll kill us."

After defendant left, L.H. and Glenn called their father, Glenn Covington, who came home within 10 minutes and called the police. The children told the police that the assailant had a beard, a mustache and a scar over his right eye and was wearing a skull cap, a black jacket and jeans. The children were then taken to the hospital.

Five days later on April 1, 1990, Covington's family had several friends over to their apartment for dinner. While preparing the food, they ran out of tomatoes. Glenn went to a nearby store with his godfather (Selso) and two other friends (Chico and Chris) to buy some additional food. At the store Glenn saw defendant standing in line and identified defendant to his companions. Chico ran back to the Covington apartment and told Covington that Glenn had seen defendant in the store. Covington immediately left to go to the store. At the same time Chico arrived at the Covington apartment, Detectives

Richard Paladino and Joseph Fine were also at the Covington apartment interviewing L.H.

When defendant left the store, Glenn, his father and their other companions chased him until he ran into a 14-story apartment building. The detectives arrived at the building and were told that defendant was wearing a red Bulls jacket. The detectives proceeded to enter and search the building. By this time, a crowd of people had gathered. Covington knew many of the people and he told them what was going on, including what the suspect had done to his children.

In his search of the building, Detective Paladino found and handcuffed a man in the building but when he brought the man outside, Glenn told the police that he was not the man. When questioned by some people in the crowd, the police explained that they were involved in an investigation and had chased an offender into the stairwell. The people told the police that they had seen the suspect, stopped him and asked him why he was running up the stairwell. When the man responded that the police were chasing him, the people then let him go. Detective Paladino replied that the person being chased was wanted for raping a nine-year-old girl. The detectives told Glenn and his companions to go home because the suspect would probably not come out unless the crowd dispersed and called for police assistance to conduct a floor-by-floor search.

Some residents of the building then "took it upon themselves to go up into the building and to conduct their own search before any police officers came." Shortly thereafter the detectives heard a commotion on the upper floors and "heard somebody yell, we got him, we got him." The detectives went to the elevator in the building and when the elevator door opened, some people appeared with defendant, who had blood on his face. Detective Paladino immediately handcuffed defendant and took him into custody.

At the police station, defendant denied the allegations against him. At a lineup, Glenn made a positive identification of defendant and L.H. stated that she thought defendant was her assailant. According to Detective Paladino's testimony, defendant then made an oral statement which the detective transcribed into a written statement subsequently signed by defendant.

In his statement, defendant said that he was high on drugs and walking down the street when he entered the vestibule of the apartment building. Defendant "tiptoed in the hall up the stairs," heard some keys, saw two children opening a door, and walked into the apartment with them. Defendant asked the children if anyone was home and when they said no, he asked where the money was. Defendant told the children to open some drawers in their parent's

bedroom because he was looking for money or jewelry. Defendant then took the children to their bedroom and told the boy to stay in the back room. Defendant took the girl into another room, told her to get a bag and put the VCR in the bag. Before leaving, defendant had to go to the bathroom and he took the girl with him so she would not run. When defendant began to urinate, the girl became frantic and he told her to face away from him. When defendant finished in the bathroom, he took $40 from a bedroom dresser and left.

After Detective Paladino testified at trial, defendant moved to quash his arrest and suppress evidence on the grounds that the police lacked probable cause to arrest defendant. Defendant argued that no one identified defendant as the assailant at the time of his arrest at the high-rise building because Glenn and his companions left the scene before his arrest. Defendant also argued that he was not wearing a red Bulls jacket at the time of his arrest even though the police had been told that the man being pursued was wearing one. The trial court denied defendant's motion and the trial continued.

At trial defendant testified that he was arrested after being chased, detained and beaten by a group of people at the high-rise apartment building. Defendant said that the written statement attributed to him was already prepared before he saw it and he was told to sign it by the police detectives. Defendant also denied committing the crimes with which he was charged. Defendant admitted that he was at the grocery store on April 1 when he began being chased and that he ran into the high-rise building.

Defendant also presented Officer Thomas Krupowicz as an expert witness who works as a latent fingerprint technician. Krupowicz testified that he was unable to match defendant's finger and palm prints with prints recovered from L.H.'s apartment. Krupowicz also testified that such matches are made only about 10% to 11% of the time.

The jury convicted defendant of two counts of aggravated criminal sexual assault, one count of armed robbery and one count of home invasion. Following a sentencing hearing, the trial court imposed two 20-year sentences of imprisonment to run consecutively on the two counts of aggravated criminal sexual assault. A 20-year sentence, to run concurrently with the other sentences, was also imposed for the home invasion count. The armed robbery count merged into the home invasion count.

On appeal defendant first asserts that the trial court erred in denying his motion to quash his arrest and suppress evidence because there was insufficient basis for his arrest. Defendant argues that

probable cause to arrest did not exist because: (1) no one was present at the time of his arrest to identify him; (2) the statements from the crowd of people who had gathered at the high-rise building constituted hearsay; and (3) the police never identified the people who had detained defendant and thus defendant had no opportunity to cross-examine or challenge the veracity of their statements.

A trial court's decision on a motion to quash arrest and suppress evidence ordinarily will not be disturbed on review unless its ruling is clearly erroneous. *People v. Foskey* (1990), 136 Ill. 2d 66, 76, 554 N.E.2d 192.

Probable cause to arrest exists where "the facts and circumstances within the arresting officer's knowledge are sufficient to warrant a man of reasonable caution in believing that an offense has been committed and that the person arrested has committed the offense." (*People v. Moody* (1983), 94 Ill. 2d 1, 7, 445 N.E.2d 275.) Although this standard requires more than mere suspicion, it does not require the police to have evidence sufficient to convict the defendant at the time of arrest. (*Moody*, 94 Ill. 2d at 7.) Moreover, probable cause can be based upon evidence not admissible at trial. (*People v. Marino* (1970), 44 Ill. 2d 562, 573, 256 N.E.2d 770.) Courts must remain cognizant of the observation that the police " 'often must act upon a quick appraisal of the data before them, and the reasonableness of their conduct must be judged on the basis of their responsibility to prevent crime and to catch criminals.' " *People v. Jones* (1964), 31 Ill. 2d 42, 47, 198 N.E.2d 821, quoting *People v. Watkins* (1960), 19 Ill. 2d 11, 19, 166 N.E.2d 433.

Whether probable cause to arrest exists is determined by the totality of the circumstances. (*People v. Earnest* (1991), 224 Ill. App. 3d 90, 95, 586 N.E.2d 449, citing *Illinois v. Gates* (1983), 462 U.S. 213, 76 L. Ed. 2d 527, 103 S. Ct. 2317.) Flight or the use of evasive maneuvers from the police, although not determinative by itself, is a consideration in determining the existence of probable cause and when coupled with reasonable suspicion to stop an individual can constitute probable cause. (*People v. Shelby* (1991), 221 Ill. App. 3d 1028, 1044, 582 N.E.2d 1281.) In determining the validity of a warrantless arrest, our review necessarily focuses on the information available to the police before the arrest. (*People v. Adams* (1989), 131 Ill. 2d 387, 398, 546 N.E.2d 561.) Our determination depends on whether the police acted reasonably under the circumstances. *People v. Halmon* (1992), 225 Ill. App. 3d 259, 276, 587 N.E.2d 1182.

■ We find that the information known to the police prior to defendant's arrest was sufficient to establish probable cause. The record reveals that the police clearly knew that crimes had been

committed, that Glenn positively identified defendant in the store and that defendant was chased into a high-rise apartment building. While looking at the exposed portions of the floors of the building, either Glenn or one of his companions pointed out defendant to the police, saying "there he is now." When he was sighted by the police, defendant bolted up the stairs. The people who had congregated at the scene informed the police that they had passed a man on the stairs who admitted that he was being chased by the police and the people subsequently detained the same man. From the circumstances in this case, we cannot say that the trial court abused its discretion in denying defendant's motion to quash his arrest and suppress evidence.

■ Next defendant had asked this court to vacate his consecutive sentence if the Illinois Supreme Court were to find the mandatory consecutive sentencing clause (Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—4(a)) unconstitutional in *People v. Bole* (1993), 155 Ill. 2d 188, 613 N.E.2d 740, a case which was pending before the supreme court at the time of defendant's appeal.

Initially we note that the State claims this issue has been waived by defendant for failure to attack the constitutionality of the statute in question in the trial court. We disagree.

A constitutional challenge to a statute can be raised at any time. (*People v. Bryant* (1989), 128 Ill. 2d 448, 454, 539 N.E.2d 1221; see also *People v. Christy* (1990), 139 Ill. 2d 172, 176, 564 N.E.2d 770 (the issue regarding the constitutionality of the statutory penalties for aggravated kidnapping and armed violence was not waived by failing to raise it in the circuit court); *People v. Kluxdal* (1991), 225 Ill. App. 3d 217, 228, 586 N.E.2d 701 (waiver did not apply to the defendant's constitutional challenge to the guilty but mentally ill statute where it was first raised on appeal); *People v. Knott* (1991), 224 Ill. App. 3d 236, 260-61, 586 N.E.2d 479 (failure to raise the issue of the constitutionality of the Habitual Criminal Act (Ill. Rev. Stat. 1989, ch. 38, par. 33B—1 *et seq.*) in the circuit court did not waive the issue on review).) This court acknowledged that the relationship between waiver and constitutional challenges suffers from an "admittedly muddled history" but the *Bryant* decision currently leaves no doubt that the waiver rule does not apply when the issue raised on appeal is the unconstitutionality of a statute. (*People v. Carter* (1992), 228 Ill. App. 3d 526, 532, 592 N.E.2d 491; see also *People v. Wade* (1989), 131 Ill. 2d 370, 375-76, 546 N.E.2d 553.) Accordingly, we find that defendant has not waived his constitutional challenge by failing to raise it in the circuit court.

The mandatory sentencing clause provides:

"The court shall not impose consecutive sentences for offenses which were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective, unless, one of the offenses for which defendant was convicted was a Class X or Class 1 felony and the defendant inflicted severe bodily injury, or where the defendant was convicted of a violation of Section 12—13 or 12—14 of the Criminal Code of 1961, in which event the court shall enter sentences to run consecutively." (Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—4(a).)

In the present case defendant was convicted of aggravated criminal sexual assault under section 12—14 of the Criminal Code of 1961 (Ill. Rev. Stat. 1989, ch. 38, par. 12—14).

In *Bole*, the defendant pleaded guilty to three counts of criminal sexual assault and the trial judge sentenced him to consecutive terms of 10, 10, and 8 years' imprisonment. (*Bole*, 155 Ill. 2d at 190.) The same victim in each instance was the 14-year-old stepdaughter of the defendant, but the offenses of which the defendant was convicted occurred on three different days in 1989, *i.e.*, February 22, February 27 and March 1. (*Bole*, 155 Ill. 2d at 191, 194.) Since each offense was committed several days apart with substantial interruptions in time, the Illinois Supreme Court concluded that the offenses were not committed in a single course of conduct and therefore section 5—8—4(a) did not apply. *Bole*, 155 Ill. 2d at 194, 199.

The court in *Bole* did not address the constitutionality of the mandatory consecutive sentencing clause. Accordingly, the *Bole* decision does not afford us any basis to consider the unconstitutionality of the statute.

Defendant has waived any other argument regarding this issue on appeal by relying solely on the outcome of the *Bole* decision and not advancing any further arguments or citation to authority for this court to consider. A reviewing court "is not simply a depository into which the appealing party may dump the burden of argument and research." *People v. Hood* (1991), 210 Ill. App. 3d 743, 746, 569 N.E.2d 228; 134 Ill. 2d R. 341(e)(7).

Having so stated the limits of our scope of review, we observe that under the present state of the law, it is doubtful that defendant would prevail in any event.

■ The due process to which defendant lightly refers is most likely his attempt to apply the eighth amendment prohibition against cruel and unusual punishments applied to Illinois by virtue of the fourteenth amendment.

The United States Supreme Court has addressed and rejected

eighth amendment challenges to mandatory prison sentences. In *Rummel v. Estelle* (1980), 445 U.S. 263, 63 L. Ed. 2d 382, 100 S. Ct. 1133, the Supreme Court held that a mandatory life sentence did not constitute cruel and unusual punishment where the defendant received such sentence in accordance with a recidivist statute after he had been convicted, successively, three times of property-related felonies, *i.e.*, fraudulent use of a credit card to obtain $80 worth of goods or services, passing a forged check in the amount of $28.36, and obtaining $120.75 by false pretenses, a total of $229.11! The Supreme Court clearly stated in *Rummel* "that for crimes concededly classified and classifiable as felonies, that is, as punishable by significant terms of imprisonment in a state penitentiary, the length of the sentence actually imposed is purely a matter of legislative prerogative." *Rummel*, 445 U.S. at 274, 63 L. Ed. 2d at 391, 100 S. Ct. at 1139.

Similarly, in *Hutto v. Davis* (1982), 454 U.S. 370, 70 L. Ed. 2d 556, 102 S. Ct. 703, the Supreme Court held that two consecutive 20-year prison terms and two separate fines of $10,000 did not violate the ban against cruel and unusual punishment where the defendant had been convicted on separate counts of possession with intent to distribute and the distribution of nine ounces of marijuana.

However, in the year following *Davis*, the Supreme Court found that the eighth amendment prohibited a life sentence without possibility of parole for a seventh nonviolent felony. (*Solem v. Helm* (1983), 463 U.S. 277, 77 L. Ed. 2d 637, 103 S. Ct. 3001.) Prior to the defendant's last felony conviction for uttering an apparently bad check for $100, the defendant in *Solem* had been convicted of six other nonviolent felonies, *i.e.*, three convictions for third-degree burglary and convictions for obtaining money under false pretenses, grand larceny, and third-offense driving while intoxicated. The *Solem* court examined the issue by declaring that the eighth amendment prohibits sentences which are disproportionate to the crime committed and concluded that the life sentence imposed was significantly disproportionate to the crime committed.

Most recently in *Harmelin v. Michigan* (1991), 501 U.S. 957, 115 L. Ed. 2d 836, 111 S. Ct. 2680, the Supreme Court held that a mandatory term of life in prison without possibility of parole for possessing 672 grams of cocaine did not constitute cruel and unusual punishment under the eighth amendment. Notably, the *Harmelin* court disagreed as to the continuing viability of the *Solem* decision, with two justices opining that the *Solem* decision was "simply wrong" and should be overruled because the eighth amendment does not include a proportionality guarantee. Notwithstanding this disagree-

ment, the majority agreed that although severe, mandatory penalties may be cruel and yet are not unusual in the constitutional sense.

From these decisions of the Supreme Court, we conclude that a constitutional challenge to the mandatory consecutive sentences applied in the present case would necessarily fail.

For all the foregoing reasons, we affirm defendant's convictions and sentences.

Affirmed.

TULLY, P.J., and RIZZI, J., concur.