FIRST DIVISION

December 1, 1997

No. 1-96-0382

THE PEOPLE OF THE STATE OF ILLINOIS,

Plaintiff-Appellee,

v.

FRANK EVANS,

Defendant-Appellant.

)

)

)

)

)

)

)

)

)

Appeal from the

Circuit Court of

Cook County

No. 94 CR 27859

Honorable

Stanley Sacks,

Judge Presiding.

JUSTICE O'BRIEN delivered the opinion of the court:

Following a bench trial, defendant, Frank Evans, was convicted and sentenced to a 25-year prison term for controlled substance trafficking and a 15-year concurrent term for possession with intent to deliver more than 30 grams of a substance containing a controlled substance.  Defendant appeals, contending (1) the trial court erred by denying his motion to quash arrest and suppress evidence; (2) the trial court erred by denying his motion to dismiss the indictment; and (3) the State failed to prove him guilty beyond a reasonable doubt.  We affirm.

At the hearing on the motion to quash arrest and suppress evidence, defendant testified that between 6 and 7 a.m. on October 13, 1994, he arrived at O'Hare airport on a flight from Las Vegas.  Defendant got off the plane and proceeded to the baggage claim area, where he retrieved his two black suitcases and started to head for the exit.   

Defendant testified that before getting out the door, a male officer and a female officer approached and showed him their badges.  The male officer began talking to defendant, but the officer never told defendant that he did not have to answer or that he was free to leave.  The male officer asked defendant why he was in Chicago, and defendant said he was there to visit a friend.  The officer never asked where in Chicago the friend lived.  The officer asked to see defendant's flight ticket, but defendant refused to produce it because he "didn't want to deal with [the officers]."  The officer also asked for identification, but defendant said he did not have any identification.  

Defendant testified the male officer then said he and his luggage were going to be detained, at which point another male officer walked up and joined the other two officers around defendant.  Defendant testified he could not recall the officer telling him that his bag was being detained to allow a narcotics dog to sniff it, and he could not recall the officer telling him he was being detained so that the officers could obtain his identification.

Defendant testified the three officers started to walk defendant to another room.  Before getting to the room, defendant turned and ran because he "didn't want to go with them."  One of the male officers chased defendant, tackled him, and put him in handcuffs.

Defendant testified the three officers forced him into a small, private room in the airport and threw him onto a chair.  The female officer struck him in the face, and one or more of the officers asked him for the combination of his suitcases, which he refused to give.  The two male officers took his suitcases into an adjoining room, where they broke open the locks and recovered PCP. Defendant testified he never gave the officers permission to break open those locks.

Officer William Grant testified he was a Drug Enforcement Administration (DEA) agent assigned to O'Hare airport.  On October 13, 1994, he and his partners, Officer Judy Martin and Special Agent James Stewart, were watching America West Airlines flight 701 as it arrived in Chicago from Las Vegas.  Officer Grant explained that flight 701 is a late-night flight routinely used by drug-traffickers from the west coast.

Officer Grant observed defendant exit the plane.  Defendant "looked like he didn't know what he was doing.  He looked nervous as he was looking back and forth and up and down the concourse.  He walked very slowly down the corridors."

Officer Grant and Officer Martin followed defendant and the other passengers to the baggage claim area, where defendant "was looking around the whole baggage claim area and continuously turning around and looking at the area where [Officers Grant and Martin] were standing."  Defendant then approached the baggage carousel and claimed two large hard suitcases.

Officer Grant and Officer Martin approached defendant, identified themselves as police officers, and said they would like to ask him a few questions.  Defendant said "o.k."  Officer Grant then told defendant he was not under arrest and could leave at any time, but that he (Grant) would like to see defendant's plane ticket.  Defendant responded that he did not have the plane ticket and that he must have left it on the plane.  Officer Grant then asked defendant for some photo identification, but defendant responded that he had no identification with him.  Officer Grant noticed at this time that defendant's hands were trembling and his voice was cracking.  

Officer Grant asked defendant if he lived in Chicago, and defendant said "no," he was in Chicago to visit some friends.  Officer Grant asked defendant where his friends lived, and defendant said he did not know.  Officer Grant asked defendant how he was going to get to his friends' house if he did not know where they lived.  Defendant said he did not know.  

Officer Grant told defendant he was making a routine narcotics investigation and that defendant was still free to leave, but that he would like to ask defendant some more questions.  Defendant said he would answer some more questions.  Officer Grant asked defendant if the luggage he claimed at the baggage area was his and if he packed the luggage himself.  Defendant responded affirmatively to both questions.  Officer Grant also asked defendant if anyone had given him packages to carry to Chicago and if he was in possession of a large amount of narcotics or U.S. currency.  Defendant responded negatively to those questions.

Officer Grant then asked defendant for consent to search his luggage.  Defendant pulled a pack of cigarettes out of his pocket, and in a low voice said he did not know the combination to his suitcases.  Officer Grant asked defendant how he was going to open the suitcases once he got to his friends' house, and defendant said he did not know.

Officer Grant told defendant he was going to detain defendant's luggage to allow a narcotics canine to sniff it for drugs.  If the canine made a "positive hit" on the luggage, Officer Grant said he would get a search warrant and open it.  Officer Grant also told defendant he was going to detain defendant until Grant could verify his identity.  Officer Grant wanted the identification of defendant to ensure he was not wanted for any crimes and to get an address from him so that if the narcotic canines did not make a positive hit on the suitcases, Grant could send the suitcases back to defendant.

Officer Grant testified that up to this point, he had not touched defendant, placed handcuffs on him, or told him he could not leave.  While Grant had been questioning defendant, Officer Martin stood next to Grant on his left-hand side.  After Officer Grant told defendant he was being detained, Agent Stewart came over and asked for Officer Martin's assistance in speaking with another passenger.  Officer Martin and Agent Stewart left for five minutes, during which time defendant sat down on one of the suitcases and lit a cigarette.  

After Officer Martin and Agent Stewart returned, Officer Grant took one suitcase, Officer Martin took the other, and Agent Stewart and defendant followed them to an elevator about 15 to 20 feet away.  They took the elevator downstairs and started walking toward the DEA office, which was approximately 150 yards from the elevator.  

Soon after they all started walking toward the DEA office, defendant turned and ran in the opposite direction.  Officer Grant and Agent Stewart chased defendant and caught him on an escalator about 50 to 75 yards from where defendant had first run from the officers.  Two uniformed Chicago police officers helped Officer Grant and Agent Stewart secure defendant, and Officer Grant then handcuffed defendant.  

Officer Grant, Agent Stewart, and defendant returned to where Officer Martin was standing with the suitcases, and then they all walked over to the DEA office.  In the office, Officer Grant removed the handcuffs and put defendant on a chair.  When defendant sat down, he told the officers they could look in the suitcases.  Officer Grant asked defendant for the combination to the suitcases, and defendant said he did not have the combination but that the officers could go ahead and open the locks on them.  Officer Grant forcibly opened one of the suitcases and found a five-gallon can covered in babypowder and surrounded by plastic bags and pillows.  Officer Grant observed what he believed was PCP in the can, so he arrested defendant
.

The trial court found the initial encounter between the officers and defendant was consensual and that a seizure occurred only when the officers told defendant they were detaining him and his bags.  The court determined the officers "might" have had an articulable suspicion to detain defendant's bags based on his "odd" answers regarding his reason for being in Chicago and his expressed lack of knowledge regarding the combination to his suitcases.  The court expressed concern whether the officers had reasonable suspicion to detain defendant.  However, the court determined that the issue whether the officers had a reasonable suspicion to detain defendant and/or his luggage was "academic," because defendant had abandoned the luggage when he ran away and left it with the officers.   The court found that defendant forfeited any privacy interest when he abandoned the luggage.  The court denied the motion to quash arrest and suppress evidence. 

The court later held a hearing on defendant's motion to dismiss the indictment based on the State's failure to produce the alleged PCP for independent testing.  At the hearing, Sergeant John Malloy testified that after defendant's arrest on October 13, 1994, officers transported the alleged PCP to the Chicago Police Department crime lab.  The crime lab took a sample out of each container.  Sergeant Malloy and Gerald Pazin, an employee at the crime lab, testified that the samples taken on October 13 were still in existence.  The parties stipulated that Bill Frost, a supervisor of the Evidence and Recovered Property Section of the Chicago Police Department, would testify that the two vial samples are presently stored at 26th and California.  

Sergeant Malloy further testified that on October 14, 1994, he received a phone call from a supervisor in the chemistry unit of the crime lab, telling him the two five-gallon containers of PCP were dangerous and too much for the crime lab to handle.  Sergeant Malloy contacted Commander Grubsic of the Bomb and Arson Unit, who sent two explosives technicians to the crime lab to pick up the containers.  On October 14, the technicians transported the containers to an "explosive bunker" at 103rd and Doty. 

Sergeant Malloy testified he had subsequent conversations with Commander Grubsic, who told Malloy that, contrary to earlier indications, the Bomb and Arson Unit could not dispose of the containers.  Grubsic suggested that Malloy ask the DEA lab to take the containers.  Malloy contacted the DEA lab, which told him it would not take such large quantities of PCP.  

Sergeant Malloy testified he eventually contacted Chemical Waste Management, which agreed to take the containers.  On October 19, Malloy met two employees of Chemical Waste and an employee of Reidel Environmental Services at 103rd and Doty.  The Chemical Waste employees took samples from the containers and turned them over to Reidel Environmental.  Malloy testified the Chemical Waste employees then transported the containers to a high intensity incinerator in Swansea, Illinois.  

Larry Lewis, the director of operations of the Industrial and Environmental Analyst (IEA), testified that on October 19, 1994, IEA received two plastic containers of a liquid substance from Reidel Environmental.  IEA employees extracted samples of the liquid from the containers, tested them, and determined that the liquid was hazardous waste.  Lewis testified that one of the samples remains in a freezer at the IEA facility.

The trial court denied the motion to dismiss the indictment, finding that two vials of the alleged PCP recovered on October 13, and another vial recovered on October 19, were still in existence and available for testing.  The court also determined the officers had acted in good faith in destroying the evidence.  

The cause proceeded to a bench trial, where Officer Grant testified  that after arresting defendant at O'Hare on October 13, he transferred custody of the two five-pound cans to Officer Hennelly.   Officer Hennelly testified he took the cans to the crime lab on October 13 and used a single glass pipet to take a sample from each of them.  Officer Hennelly did not clean the pipet after taking the first sample, and he could not tell from the lab report which was the sample he had taken from the first can.  

Officer Hennelly testified he gave the samples to Jerry Pazin, a chemist at the lab.  Officer Hennelly also testified that members of the Bomb and Arson Unit of the Chicago Police Department later took the two five-gallon containers to a bunker at 103rd Street.  

Victor Bell, an emergency response manager for Smith Environmental Technology, formerly known as Reidel Environmental Services, testified that on October 19, 1994, he went to the 103rd Street bunker to take samples from the two containers recovered from defendant.  Chemical Waste personnel, at the site to dispose of the cans, actually took the samples for Mr. Bell.  The samples were sealed in Ziploc bags and transported to the IEA labs and turned over to a project manager there, Jim Dowse.  Jim Dowse testified that on September 28, 1995, he turned those samples over to Officer Hennelly.  Officer Hennelly testified he transported the samples to the crime lab.

Gloria Grindle, a chemist at the crime lab, testified that on November 7, 1994, she weighed one of the samples taken by Officer Hennelly on October 13.  That sample weighed 5.54 grams.  Ms. Grindle performed a preliminary precipitant test on the sample, which indicated the possible presence of PCP.  Ms. Grindle then performed a gas chromatograph mass spectro analysis, or GCMS test, which confirmed the presence of PCP.  

Ms. Grindle testified that on November 9, 1994,  she weighed the other sample taken by Officer Hennelly on October 13.  She concluded that the sample weighed 5.26 grams and, using the GCMS test, she confirmed the presence of PCP.

On September 28, 1995, Ms. Grindle weighed a sample of the liquid taken by Chemical Waste on October 19.   Ms. Grindle determined the sample weighed 36.63 grams and, using the GCMS test, she confirmed the presence of PCP. 

 Ms. Grindle explained that the GCMS readout gave her an "abundance" reading reflecting the concentration level of a sample.  A very concentrated sample contains a high abundance of the substance being tested.  The abundance readout for the sample weighing 5.26 grams was 6 million and the abundance readout for the sample weighing 5.54 grams was 8 million.  The abundance readout for the sample weighing 36.63 grams was 2 million.

Ms. Grindle testified if someone used a pipet to take a sample out of a five-gallon can and then used the same pipet, without cleaning it, to take a sample from a second five-gallon can, there possibly could be contamination in the sample taken from the second can.  However, Ms. Grindle stated it would be very unlikely that the sample taken from the second can would have an abundance reading as high as 6 million if the only PCP in the second can came from the small amount left on the pipet after it was used in the first can.  Ms. Grindle also stated it was unlikely that a second sample taken from the second can would produce an abundance reading of 2 million if the only PCP in the second can came from the small amount left on the pipet after it was used in the first can.  

The trial court convicted defendant of controlled substance trafficking and possession with intent to deliver more than 30 grams of a substance containing a controlled substance.  The court sentenced defendant to a 25-year prison term for the controlled substance trafficking and a concurrent 15-year prison term for the possession with intent to deliver.  Defendant appeals.

First, defendant argues the trial court erred by denying his motion to quash arrest and suppress evidence.  For purposes of a motion to quash arrest and suppress evidence, the trial court is in the best position to determine the credibility of the witnesses and resolve conflicts in testimony, because it has heard the testimony and observed the demeanor of the witnesses.  
People v. Carter
, 288 Ill. App. 3d 658, 662 (1997).  Where a motion to quash arrest and suppress evidence turns on the weight and credibility of the evidence, we will not disturb the trial court's ruling unless it is manifestly erroneous.  
Carter
, 288 Ill. App. 3d at 662.

Defendant contends the police officers improperly seized him and his luggage at O'Hare airport on October 13, 1994, in violation of the fourth amendment to the United States Constitution.  The fourth amendment to the United States Constitution and article I, section 6, of the Illinois Constitution protect persons from unreasonable searches and seizures.  U.S. Const., amend. IV; Ill. Const. 1970, art. I, §6.  A seizure occurs when a law enforcement officer uses physical force to restrain a person's freedom of movement or shows authority such that a reasonable person would believe he was not free to leave.  
People v. Anaya
, 279 Ill. App. 3d 940, 945 (1996); 
United States v. Mendenhall
, 446 U.S. 544, 64 L. Ed. 2d 497, 100 S. Ct. 1870 (1980).  No fourth amendment violation occurs when an officer approaches a person in a public place, such as the public concourse of an airport, and asks if he is willing to answer some questions and provide identification. 
Mendenhall
, 446 U.S. at 555, 64 L. Ed. 2d at 510, 100 S. Ct. at 1877; 
Florida v. Royer
, 460 U.S. 491, 497, 75 L. Ed. 2d 229, 236, 103 S. Ct. 1319, 1324 (1983).  Thus, any information given to police during such a consensual encounter will not be suppressed.  
People v. Forrest
, 172 Ill. App. 3d 385, 390 (1988).

Officer Grant testified he and Officer Martin approached defendant in the baggage claim area of O'Hare.  The officers were dressed in civilian attire, and Grant was not carrying a weapon that day.  Grant initially told defendant he was not under arrest and could leave at any time, but that he (Grant) would like to ask defendant some questions and see his plane ticket.  The officers did not touch defendant, nor did they block his access to the exit doors.  Officer Grant testified defendant proceeded to answer questions posed to him.  Defendant disputes Officer Grant's testimony, but the trial court found Grant's version of events credible, and we will not substitute our judgment therefor.  The trial court determined this initial exchange between defendant and the police was consensual and that a reasonable person would have believed he was free to end the conversation and walk away.  We cannot say the trial court's determination was manifestly erroneous.  See 
People v. Furlong
, 217 Ill. App. 3d 1047, 1052 (1991) (finding a consensual encounter where officers approached defendant in O'Hare, asked if he would answer some questions, displayed no weapons, and defendant said "sure.") 

However, the State concedes that the consensual nature of the encounter ended, and a seizure occurred, when defendant stated he did not know the combination to his luggage and Officer Grant stated he was detaining defendant and his luggage.   Accordingly, we must determine whether said detentions were constitutional.   We begin by examining the detention of defendant's luggage; then we will examine the detention of defendant's person.  

For the detention of defendant's luggage to pass constitutional muster, the officers must have had a reasonable and articulable suspicion that the luggage contained contraband. 
People v. Steels
, 277 Ill. App. 3d 123, 128 (1995);  
United States v. Place
, 462 U.S. 696, 77 L. Ed. 2d 110, 103 S. Ct. 2637 (1983); 
Terry v. Ohio
, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968).

Generally, a reasonable and articulable suspicion to detain a defendant's luggage is found where the defendant arrives from a source city or transshipment city for narcotics, exhibits nervous or unusual mannerisms, and gives incorrect, conflicting, unsatisfactory, or untruthful answers to a police officer's questions.  See 
People v. Olivarez
, 279 Ill. App. 3d 90 (1996); 
 
People v. Statham
, 209 Ill. App. 3d 352 (1991); 
People v. Forrest
, 172 Ill. App. 3d at 393.

Here, defendant flew in on a late-night flight routinely used by narcotics traffickers.  Defendant appeared nervous upon exiting the plane and later gave conflicting and 
unsatisfactory answers to the officers' questions.   In particular, defendant stated he was in town to see some friends, but he did not know where they lived or how he was going to get there.  Defendant also stated that although the suitcases he claimed at the baggage area were his and he had packed them himself, he did not know the combinations to them and did not know how he was going to open them.  The trial court determined that defendant's arrival on a flight routinely used by drug traffickers, coupled with his nervous behavior and his conflicting answers to the officers' questions, constituted a reasonable articulable suspicion to detain his luggage.  The finding of the court was not manifestly erroneous.

United States v. Place
, 462 U.S. 696, 77 L. Ed. 2d 110, 103 S. Ct. 2637 (1983), and 
Reid v. Georgia
, 448 U.S. 438, 65 L. Ed. 2d 890, 100 S. Ct. 2752 (1980), cited by defendant, do not compel a different result.  In 
Place
, officers approached Place in Miami International Airport while he was waiting to buy tickets to New York's La Guardia Airport.  They requested his airline ticket and identification.  Place complied and consented to a search of the two suitcases he had checked.  The officers decided not to search the luggage, though, because Place's flight was about to depart.  
Place
, 462 U.S. at 698, 77 L. Ed. 2d at 115, 103 S. Ct. at 2639-40.

Before leaving, Place made a remark that aroused the officers' suspicion, and they then inspected the address tags on his checked luggage and noted discrepancies in the street addresses.  Further investigation revealed neither address existed and that a telephone number Place had given the airline belonged to a third address on the same street.  The officers then called DEA authorities in New York to relay their information about Place.  
Place
, 462 U.S. at 698, 77 L. Ed. 2d at 115, 103 S. Ct. at 2640.

Two DEA agents approached Place in La Guardia after he had deplaned and claimed his two bags.  Place refused to consent to a search of his luggage.  The agents then took the bags to Kennedy Airport, where trained dogs reacted positively to the smaller of the two bags.  Approximately 90 minutes had elapsed since the agents had seized Place's luggage.  Because it was late on a Friday, the agents kept the bags until Monday morning, when they secured a search warrant for the smaller bag.  Upon opening the bag, the agents discovered it contained cocaine.  
Place
, 462 U.S. at 698-99, 77 L. Ed. 2d at 115-16, 103 S. Ct. at 2640.

The Supreme Court held the 90-minute detention of Place's luggage was in itself sufficient to render the seizure outside the permissible scope of a 
Terry
 stop.  
Place
, 462 U.S. at 709, 77 L. Ed. 2d at 122, 103 S. Ct. at 2645.  The Court further held that the fourth amendment violation was exacerbated by the agents' failure to accurately inform Place about where they were transporting his luggage, the length of time he might be dispossessed, and what arrangements would be made for return of the luggage if the bags contained no drugs.  
Place
, 462 U.S. at 710, 77 L. Ed. 2d at 122-23, 103 S. Ct. at 2646.  The Court also noted that the agents could have arranged for trained dogs to be available at La Guardia, thereby minimizing the intrusion on Place's fourth amendment interests.  
Place
, 462 U.S. at 709, 77 L. Ed. 2d at 122, 103 S. Ct. at 2645-46.

Unlike 
Place
, the officers here detained defendant's bags for well under 90 minutes, and Officer Grant informed defendant where they were taking his luggage and the reason for the detention.  Officer Grant also testified that although a dog was not available at the airport when he detained defendant's luggage, a dog would later be available at the airport to perform the search.  Clearly, the facts of this case differ considerably from those in 
Place
, and therefore 
Place
 provides no support for defendant's argument that the officers improperly seized his luggage.

Reid
 is also inapposite.  In 
Reid
, the Supreme Court held that a DEA agent had no reasonable suspicion to detain petitioner where (1) petitioner had arrived from a source city for cocaine; (2) petitioner arrived in the early morning; (3) petitioner and his companion appeared to be trying to conceal that they were traveling together; and (4) they had no luggage other than their shoulder bags.  The Court determined that petitioner's early morning arrival from a source city for drugs, carrying only a shoulder bag, "describe[s] a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure."  
Reid
, 448 U.S. at 441, 65 L. Ed. 2d at 894, 100 S. Ct. at 2754.  The Court further determined that petitioner's manner of walking through the airport was "simply too slender a reed to support the seizure in this case."   
Reid
, 448 U.S. at 441, 65 L. Ed. 2d at 894, 100 S. Ct. at 2754.

Unlike 
Reid
, defendant here not only arrived on a flight routinely used by drug traffickers and exhibited nervous mannerisms in the airport, but also gave conflicting and unusual answers to police officers' questions.  Defendant's conflicting answers, in conjunction with his arrival from a flight routinely used by narcotics traffickers and his nervous behavior, differentiate this case from 
Reid
 and provide a reasonable suspicion for the detention of his luggage.

We turn next to the detention of defendant's person.  A person may be briefly detained, without probable cause to arrest him, where a reasonable and articulable suspicion exists that the person seized is engaged in criminal activity.  
Terry v. Ohio
, 392 U.S. 1; 20 L. Ed. 2d 889; 88 S. Ct. 1868; 
Reid
, 448 U.S. 438; 65 L. Ed. 2d 890; 100 S. Ct. 2752.  As discussed above, the officers had a reasonable suspicion that defendant was transporting narcotics, and such a suspicion authorized a limited, investigative detention of defendant short of a full arrest and short of probable cause.  

However, defendant argues that the officers exceeded a 
Terry
 stop when they began walking him and his luggage away from the baggage claim area and toward the small DEA office, which was more than 150 yards away.  Defendant claims he was under arrest at that point and that the arrest was illegal because the officers lacked probable cause.   

In support, defendant cites 
Florida v. Royer
, 460 U.S. 491, 75 L. Ed. 2d 229, 103 S. Ct. 1319 (1983).  Two plainclothes detectives observed Royer at Miami International Airport.  They determined he fit a "drug courier profile," in particular because he was young, appeared pale and nervous, paid for his ticket in cash, carried heavy American Tourister luggage, and completed his luggage identification tag with only the name "Holt" and the destination "La Guardia."  
Royer
, 460 U.S. at 493, 75 L. Ed. 2d at 233-34, 103 S. Ct. at 1322.

The detectives approached Royer, identified themselves as policemen, and asked if they could speak with him.  Royer responded affirmatively.  At the detectives' request, Royer produced his airline ticket and driver's license.  The airline ticket bore the name "Holt," while the driver's license bore the name "Royer."  The detectives asked about the discrepancy, and Royer explained a friend had made the reservation under the name "Holt."  Royer became nervous during the conversation, and the detectives told him they suspected he was transporting narcotics.  
Royer
, 460 U.S. at 494, 75 L. Ed. 2d at 234, 103 S. Ct. at 1322.

The detectives did not return Royer's airline ticket and identification, but asked him to accompany them to a room adjacent to the concourse, about 40 feet away.  Royer went with the officers to the room, described as a "large storage closet" containing a small desk and two chairs.  Without Royer's consent, one of the detectives retrieved Royer's luggage and brought it into the room.  They asked Royer for consent to search the luggage, and Royer produced a key and unlocked one of the suitcases.  The officers found marihuana in that suitcase.  Royer stated he did not know the combination to the second suitcase, but he did not object when the detective explained that the suitcase might have to be broken open.  The detectives then pried open that suitcase and found more marihuana.  
Royer
, 460 U.S. at 494-95, 75 L. Ed. 2d at 234, 103 S. Ct. at 1322.

Prior to his trial for felony possession of marihuana, Royer moved to suppress the evidence obtained in the search of the suitcases.  The trial court denied the motion, and Royer later was convicted.  The District Court of Appeal reversed Royer's conviction, finding Royer's involuntary confinement in the small room at the airport constituted an illegal arrest and that his consent to search was invalid because tainted by the unlawful confinement.  
Royer
, 460 U.S. at 495, 75 L. Ed. 2d at 234-35, 103 S. Ct. at 1322-23.  The Supreme Court affirmed, holding that the detectives exceeded the scope of a permissible investigatory 
Terry
 stop when they moved Royer to the small "police room."  The Court premised its holding on two factors:  (1) by the time the detectives moved Royer, they already had his identification and an explanation from him as to the discrepancy between the name on his ticket and the name on his driver's license; therefore, the detectives had no need to detain him further; and, (2) less intrusive means were available to determine the content of his bags; specifically, the officers could have asked Royer for permission to search his bag prior to moving him, and/or they could have used a trained dog to detect the presence of controlled substances in his luggage.  
Royer
, 460 U.S. at 502-06, 75 L. Ed. 2d at 239-42, 103 S. Ct. at 1327-29.

Unlike 
Royer
, defendant here failed to provide any identification to the officers prior to their moving him to the DEA office.  Officer Grant testified defendant's continued detention in the DEA office was needed to verify his identity, so as to ensure he was not wanted for any crimes and to get an address from him so they could return the luggage to him if no drugs were found.  Further, the less intrusive means identified in 
Royer
 were not present here.  Specifically, the officers asked defendant for permission to search his luggage prior to moving him, but he did not know the combination.  Also, Officer Grant testified that the trained dogs were not immediately available prior to defendant's move to the DEA office.  

The fourth amendment is not a guarantee against all searches and seizures, but only against those that are unreasonable.  
United States v. Sharpe
, 470 U.S. 675, 682, 84 L. Ed. 2d 605, 613, 105 S. Ct. 1568, 1573 (1985).  We find the officers acted reasonably in moving defendant and his luggage to the DEA office, given the reasonable articulable suspicion defendant was carrying illegal drugs, as well as defendant's refusal to provide any identification and the lack of other means of determining the content of his bags.  Further, defendant's flight from the officers while en route to the office, coupled with the officers' reasonable suspicion that defendant was carrying drugs, constituted probable cause to arrest defendant.  See 
People v. Belton
, 257 Ill. App. 3d 1, 6 (1993).  Officer Grant testified that defendant later freely and voluntarily consented to the search of his luggage.  Accordingly, we find the trial court's order denying defendant's motion to quash arrest and suppress the evidence resulting from the search was not manifestly erroneous.  

As a result of our disposition, we need not discuss whether defendant's flight from the officers constituted an abandonment of his luggage.

Next,  defendant argues the trial court erred by denying his motion to dismiss the indictment where the two five-gallon cans of alleged PCP were destroyed six days after defendant's arrest.  Defendant claims the destruction of the evidence denied him an opportunity to independently test the alleged PCP and thereby constituted a violation of his due process rights.

We disagree.  Defendant was charged with  controlled substance trafficking and possession with intent to deliver more than 30 grams of a substance containing a controlled substance.   Technicians at the crime lab and IEA labs tested over 30 grams of the substance in the two five-gallon cans recovered from defendant and confirmed the presence of PCP.  Those 30-plus grams were preserved and available to the defense for independent testing.  Thus, the balance of the 10 gallons was not essential for establishing defendant's guilt or innocence, and its destruction did not prejudice defendant.  Accordingly, the trial court did not err in denying defendant's motion to dismiss the indictment.  See 
People v. Newberry
, 265 Ill. App. 3d 688, 690 (1994), 
aff'd
, 166 Ill. 2d 310 (1995) ("[i]n ascertaining whether a due process violation has occurred, the trial court must proceed with restraint and dismiss the indictment only when the defendant shows that the violation has caused actual and substantial prejudice").

Finally, defendant argues the State did not prove him guilty beyond a reasonable doubt of possession with intent to deliver more than 30 grams of a substance containing a controlled substance.  Specifically, defendant points to Officer Hennelly's testimony that on October 13 he used a glass tube to lift a sample of fluid from one of the five-gallon cans, then used the same tube, without cleaning it first, to extract fluid from the second can.  One sample weighed 5.54 grams and the other weighed 5.26 grams.  Officer Hennelly did not know which can yielded the first sample and which can yielded the second sample.  Later, on October 19, an employee of Reidel Environmental Services took a second sample from one of the cans.  That sample weighed 36.63 grams.  

Defendant argues that Hennelly contaminated the second can when he inserted in it the uncleaned glass tube containing PCP from the first can.   Defendant contends that the test result of the 36.63-gram sample taken on October 19 therefore was not reliable because that sample may have come from the contaminated second can.  That leaves the two October 13 samples, one weighing 5.26 grams and one weighing 5.54 grams.  However, one of those samples also came from the second can.  Thus, defendant contends that, at most, the State proved him guilty of possessing a little more than five grams of PCP.  

We disagree.  Ms. Grindle's testimony indicated that contamination of the second can was an unlikely cause of the high abundance of PCP contained in each sample.  The trial court expressly relied on Ms. Grindle's testimony when finding defendant guilty.  We cannot say the trial court's reliance on Ms. Grindle's testimony was misplaced; it is for the trier of fact to determine the credibility of the witnesses, the weight to be given their testimony, and the reasonable inferences to be drawn therefrom. 
People v. Steidl
, 142 Ill. 2d 204, 226 (1991).  Viewing the evidence in the light most favorable to the prosecution (
People v. Collins
, 106 Ill. 2d 237, 261 (1985)), any rational trier of fact could have found the essential elements of drug trafficking and possession with intent to deliver more than 30 grams of a substance containing a controlled substance.  Accordingly, we affirm defendant's convictions. 

As part of our judgment, we assess defendant $150 as costs for this appeal.

Affirmed.

BUCKLEY, J., concurs.  CAMBPELL, P.J., specially concurs.