(No. 55444.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appel-
lant, v. LARRY MOODY, Appellee.

*Opinion filed January 24, 1983.*

Tyrone C. Fahner, Attorney General, of Springfield, and Edward F. Petka, State's Attorney, of Joliet (John X. Breslin and Gary F. Gnidovec, of the State's Attorneys Appellate Service Commission, of Ottawa, of counsel), for the People.

Robert Agostinelli, Deputy Defender, and Frank W. Ralph, Assistant Defender, of the Office of the State Appellate Defender, of Ottawa, for appellee.

JUSTICE SIMON delivered the opinion of the court:

Defendant, Larry Moody, was convicted of burglary in the circuit court of Will County and sentenced to a four-year term of probation, which was subsequently revoked. The appellate court determined that he had been arrested without probable cause and reversed the conviction. (97 Ill. App. 3d 758.) The State appeals this reversal and the accompanying order directing a new trial.

At about 9 p.m. on December 29, 1979, Joliet police officer Robert Briney responded to a report of a burglary at the Collector's Gallery, a store selling coins and guns. He found that someone had broken a plate-glass window at the front of the store, apparently to gain entrance, and had broken a glass display case and taken two shotguns and an M-1 rifle. Officer Briney could not get a description of the burglar and could find no trace of the guns, but he discovered droplets of blood on the glass at the point of entry and on the floor at that point and beneath the display case. He called in to the police communications center with this information and suggested that the center notify hospitals in the area in case anyone appeared to have cuts treated. Some 20 minutes after he did this he and a companion officer found the three guns inside an orange pickup truck behind a building three doors from the Collector's Gallery. Thomas

Pennington, the owner of the Collector's Gallery, identi-
fied the guns as the ones taken. The truck in which they
were found belonged to neither Pennington nor the
defendant.

Around 9:30 p.m. Sergeant Clifford Erwin, also of
the Joliet police, received a radio dispatch which in-
formed him that a subject had just checked into Silver
Cross Hospital for treatment of a laceration, and that
blood had been found at the scene of a burglary at the
Collector's Gallery some time earlier. The hospital was
approximately 2½ miles from the Collector's Gallery,
and the defendant had checked into it at about 9:30. On
arriving at the hospital, Officer Erwin found defendant
lying on a hospital cart awaiting treatment for a deep
cut in his leg which was still bleeding and seemed to be
causing him pain. Moody was wearing only a hospital
gown, as the hospital staff had removed his clothes. Offi-
cer Erwin asked him where he worked, and Moody re-
plied that he worked for Joliet Paint and Glass Company.
Officer Erwin had already been informed by another of-
ficer that Moody had stated that the leg wound had been
inflicted a short while earlier by several men who had
assaulted him as he was leaving a tavern which was lo-
cated three doors from the Collector's Gallery.

Officer Erwin then gave Moody his *Miranda* rights
and questioned him about the burglary. Moody stated
that he understood his rights and admitted that he had
been in the store two days earlier looking at guns, but
denied knowledge of or involvement in the burglary. In-
stead of questioning Moody further, Erwin telephoned
Officer Briney, who was still at the Collector's Gallery.
Briney informed him about finding the guns in a truck
parked in an alley between the gun store and the tavern
behind which Moody had said he had been assaulted.
Erwin then spoke over the telephone with Thomas Pen-
nington, who told him that Moody had been in his store

two days earlier and had examined an M-1 rifle on that occasion.

After Erwin had finished his telephone conversation, Moody called him over to his cart and mentioned that he knew the store in question and was a friend of the owner. Moody also volunteered that he had handled six or seven guns the day he was in the store. At this time a police detective who was in the room with Erwin and Moody picked up one of Moody's combat boots and showed Erwin what appeared to be particles of glass in the sole. Erwin asked Moody if he would allow the police to take a blood sample from him, and Moody answered "no."

Erwin then asked if Moody would come to the police station with him for fingerprinting and photographing after he or one of his fellow officers procured clothes for him to replace his own, which the police would take. Moody's response to this is unclear from the record; his own testimony was that he did not consent, while Erwin testified that he agreed to go to the station. Erwin nonetheless told two of his fellow officers to take various articles of Moody's clothing and instructed one of the officers to bring Moody to the police station after he was finished with his hospital treatment, take his photograph and fingerprints, and let him go afterwards rather than arresting him. The record does not disclose whether Moody heard Erwin's admonition not to arrest him. Erwin testified at the suppression hearing that the reason for this admonition was that he did not believe at that time that there existed probable cause to arrest him.

Erwin's instructions were followed, and Moody was not formally arrested until three weeks later, after his fingerprints were matched with prints found inside the display case at the Collector's Gallery. Moody made a pretrial motion to quash the arrest and suppress the

physical evidence gathered from his person and his clothes on the night of December 29. He argued that the circumstances under which he went to the police station on that evening were such that he did not consider himself free to refuse to go, and that there was no warrant for his arrest at that time and no probable cause for an arrest. The circuit court agreed that an "arrest" had occurred that night, but denied the motion on the ground that probable cause existed.

In this appeal the State argues alternatively that no "arrest" occurred on December 29 and that probable cause to support an arrest existed on that night. We do not reach the former issue as we agree that there was probable cause to arrest Moody on the night of December 29.

Moody takes the position, and the appellate court held, that the objective evidence within the knowledge of the officers on December 29 did not establish grounds for a reasonable belief that he had committed the burglary at the Collector's Gallery. He argues that at the time they took Moody to the police station for photographing and fingerprinting the officers knew only that there had been a burglary, that entry was gained through a broken glass window and blood was found in the store, that guns were taken which were later found nearby in a truck which did not belong to Moody, that Moody knew the owner of the store and had examined one of the guns taken two days before the burglary, that the place where he claimed to have cut his leg was near the gun store, and that Moody was being treated for a deep cut in his leg at a hospital several miles from the store shortly after the burglary occurred. A sufficient time elapsed after the break-in occurred to have permitted him to travel from the Collector's Gallery to the hospital. This information, he argues, was not a sufficient foundation either individually or collectively for a reason-

able belief that Moody was the burglar. Moody also points out that Sergeant Erwin knew him before the burglary and that he did not believe that he had probable cause to make an arrest on December 29. He cites *People v. Miller* (1972), 7 Cal. 3d 219, 496 P.2d 1228, 101 Cal. Rptr. 860, for the proposition that under these circumstances the arresting officer's subjective beliefs must control even though as an objective matter he could have found probable cause.

We address Moody's initial argument first. Probable cause exists in the objective sense if " '*** the facts and circumstances within the arresting officer's knowledge are sufficient to warrant a man of reasonable caution in believing that an offense has been committed and that the person arrested has committed the offense.' " (*People v. Creach* (1980), 79 Ill. 2d 96, 101, quoting *People v. Robinson* (1976), 62 Ill. 2d 273, 276; see *Dunaway v. New York* (1979), 442 U.S. 200, 208 n.9, 60 L. Ed. 2d 824, 833 n.9, 99 S. Ct. 2248, 2254 n.9; *Brinegar v. United States* (1949), 338 U.S. 160, 175-76, 93 L. Ed. 1879, 1890, 69 S. Ct. 1302, 1310-11; *Carroll v. United States* (1925), 267 U.S. 132, 162, 69 L. Ed. 543, 555, 45 S. Ct. 280, 288.) This standard requires more than mere suspicion, but it does not require the arresting officers to have in their hands evidence sufficient to convict the defendant. The courts, in striking a balance between the need to protect citizens from invasions of their privacy at the whim of police officers and the countervailing need to allow leeway for efficient enforcement of the laws, are sensitive to the fact that policemen must often make their decisions to arrest or not to arrest under ambiguous circumstances and must exercise their judgment, at the risk of making a mistake. "In dealing with probable cause, *** as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on

which reasonable and prudent men, not legal technicians, act." (*Brinegar v. United States* (1949), 338 U.S. 160, 175, 93 L. Ed. 1879, 1890, 69 S. Ct. 1302, 1310.) The law requires only that insofar as police officers are allowed the luxury of making mistakes in arresting a suspect, "the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability." *Brinegar v. United States* (1949), 338 U.S. 160, 176, 93 L. Ed. 1879, 1891, 69 S. Ct. 1302, 1311; see *People v. Creach* (1980), 79 Ill. 2d 96, 102; *People v. Clay* (1973), 55 Ill. 2d 501, 504-05.

In the instant case, while we might be disposed to agree with Moody that the pieces of evidence in Sergeant Erwin's hands on December 29 *individually* would not lead to a reasonable belief that Moody was the burglar, probable cause must be determined viewing the evidence taken as a whole. (*People v. Clay* (1973), 55 Ill. 2d 501, 504.) In assessing all of the pieces of information which Sergeant Erwin possessed on the night of December 29, we must consider the radio dispatch Erwin received prior to going to Silver Cross Hospital, the fact that Moody was suffering from a deep cut in the leg which could have been inflicted by broken glass, and the fact that the hour at which Moody checked into the hospital coincided with the reports of the burglary. No report of any disturbance at the tavern near the Collector's Gallery had been made so as to give credence to Moody's story that he had been assaulted. Neither Silver Cross nor any other hospital in the vicinity reported treating anyone else with a cut that could have been caused by glass on the night of December 29, as far as Sergeant Erwin knew.

This is not a case like *Brinegar v. United States* in which there was uncertainty as to whether a crime had been committed or not; here the police knew that a burglary had been committed and were confronted with a

decision as to whether or not it was probable that Moody had committed it. Nor is the case comparable to *People v. Gabbard* (1979), 78 Ill. 2d 88, in which the only "evidence" the arresting officer had to link defendant with the crime was the fact that he was walking along a highway away from the city where the crime had occurred and the speculative possibility, not yet established at the time of the arrest, that he might have been carrying a driver's license that would identify him as the perpetrator. We believe that there were too many coincidences pointing to Moody to enable us to say that his guilt was not "probable," in the fourth amendment sense, or that the trial court's determination that it was probable was against the manifest weight of the evidence. See *People v. Clay* (1973), 55 Ill. 2d 501, 505.

Moody points to the unusual circumstances of this case and urges that inasmuch as the arresting officer's contemporaneous views as to probable cause differed from the circuit court's objective determination that probable cause existed, our conclusion should similarly differ. He cites *People v. Miller* (1972), 7 Cal. 3d 219, 496 P.2d 1228, 101 Cal. Rptr. 860, for the proposition that the probable-cause question of whether the arresting officer's subjective belief that defendant had committed a crime was objectively justified cannot logically arise where the officer did not hold such a belief. Moody concedes that this court has never passed on this precise question but invites us to adopt the California approach as the law of Illinois.

We do not agree that the fourth amendment requires more than an objective inquiry into the reasonableness of a police officer's conduct based on the evidence he has. We disagree with the basic premise of *People v. Miller* that the thrust of a probable-cause inquiry is whether the arresting officer's subjective belief was objectively justified (7 Cal. 3d 219, 226, 496 P.2d 1228, 1233, 101 Cal.

Rptr. 860, 865). The fourth amendment and the exclusionary rule guard against *unreasonable searches and seizures*, not against unreasonable beliefs *per se*. If, as explained in *Brinegar v. United States*, an arrest is to be termed "reasonable" if a reasonable man in the arresting officer's position would believe that the defendant had committed a crime, we do not understand how the fact that the officer himself did not so believe, or was uncertain as to what to believe, can change that. (See *Klingler v. United States* (8th Cir. 1969), 409 F.2d 299, 304, *cert. denied* (1969), 396 U.S. 859, 24 L. Ed. 2d 110, 90 S. Ct. 127.) The inquiry must focus on what was done and known by the police, not on what was believed, what the facts objectively viewed add up to, not what the officer on the scene believed they added up to. The latter approach would, of course, lead to differing conclusions based upon the experiences and response of a particular officer, while the former approach leads to the more uniform answer expected of the law.

Moody's final complaint is that the trial judge, in passing on the question of probable cause in the suppression hearing, resorted to his recollection of Sergeant Erwin's testimony before him in a previous case to help him make up his mind about the weight to be given Erwin's testimony that he lacked probable cause on December 29. Moody's argument is that he was denied due process of law insofar as the judge's denial of his motion was based on evidence not in the record. *People v. Harris* (1974), 57 Ill. 2d 228; *People v. Wallenberg* (1962), 24 Ill. 2d 350; see also *People v. Yarbrough* (1982), 93 Ill. 2d 421.

We agree with Moody's statement of the law. However, we do not find that it requires a reversal in this case. The excursion from the record complained of here consists of a statement volunteered by the trial judge to counsel after the close of argument, to the effect that

the judge had known Sergeant Erwin to do "a few things that are a little bit unorthodox at times." Immediately after mentioning this, the judge went on to say:

"I heard him say he did not believe he had probable cause to make the arrest at this time. The question becomes what is the effect of that. You know, if you don't have probable—if in fact he has probable cause, as the State is arguing, this is the other way around. I wonder if defendant should have both worlds, where if there is in fact not probable cause or if there is and the police officer doesn't know there is, should he get the best of both worlds. This probably has been covered by some case. I don't know offhand.

But in any event, it does appear to the Court that the general rule is that knowledge, whatever knowledge the police have, whether it is in this officer or that officer combined, knowledge of the police can be used for probable cause to effectuate an arrest, that what Sergeant Erwin did was in fact arrest this gentleman. I do find he had probable cause to make the arrest.

\* \* \*

But it is going to be the ruling of the Court that Sergeant Erwin did in fact have probable cause. He did effectuate the arrest. The arrest was lawful and the articles were seized pursuant to lawful arrest even though the sergeant himself denies he had probable cause. He says, 'I didn't have.' "

It is clear to us that the trial judge did not use his familiarity with Sergeant Erwin to help him rule on the suppression motion but ruled instead, as we do here, that Erwin's subjective beliefs did not matter because the arrest was objectively justified. This case is unlike *Harris, Wallenberg, Yarbrough* and *People v. Brantley* (1976), 43 Ill. App. 3d 616, in which the court's reliance on evidence not in the record was apparent.

The decision of the appellate court is reversed. The conviction is affirmed.

*Appellate court reversed;*
*circuit court affirmed.*