No. 2--07--0553    Filed: 12-23-09

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Boone County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 05--CF--198 |
| BENJAMIN FERRAL, | ) ) ) | Honorable Gerald F. Grubb, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the opinion of the court:

Defendant, Benjamin Ferral, was charged with two counts of unlawful possession of a fraudulent identification card (15 ILCS 335/14B(b)(1) (West 2004)). He moved to quash his arrest and suppress evidence, based on the warrantless, nonconsensual police entry into the apartment where he and the cards were found. The trial court denied the motion, and defendant was convicted following a stipulated bench trial. The court sentenced defendant to 2 years' conditional discharge and 14 days in jail and ordered him to pay a $500 fine. Defendant appeals the denial of his motion to quash and suppress. We affirm.

I. BACKGROUND

On August 11, and September 1, 2006, a hearing was held on defendant's motion to quash his arrest and suppress evidence. Officer David Dammon, a Belvidere police officer, testified that, on June 21, 2005, he encountered defendant at the Courtyard Apartments, drinking alcohol from an

open container. Defendant denied living on the property. Dammon, who when off duty provides security services for the Courtyard Apartments, informed defendant that he was going to put his name on the "banned" list and that defendant was not to return to the property. Defendant spoke in English, and Dammon did not have trouble understanding him.

Todd Moore, a Belvidere police officer, testified that, on June 24, 2005, he learned from Dammon that two people, defendant and Julio Ferral, defendant's cousin, were trespassing at the Courtyard Apartments and that the apartment managers knew the trespassers by name. Jaime Condor, one of the managers, had contacted Dammon, stating that the suspects were on the property and that the door to apartment 4 at the 2005 Lakeshore building had been kicked in. Condor further told Dammon, but not Moore, that defendant and Julio had been sleeping at the apartment. Dammon contacted Moore and asked him to go to the property.

Moore testified that he had information that both Dammon and Officer Brandon Parker had instructed defendant and Julio to stay away from the apartment complex. According to Moore, Parker had information from the suspects that they did not live at the property. Parker testified that, on June 23, 2005, he ticketed defendant for obstruction of a front windshield and for driving without a license. Defendant spoke English, and Parker had no trouble understanding him. Defendant told Parker that he lived at 412 North Main in Elburn. He did not mention the Lakeshore building or Courtyard Apartments.

Moore went to the apartment complex and met with the managers, Condor and Joey Sanfillipo, in a common area close to the apartments. The managers told Moore that, earlier that day, they had observed two men who were barred from the complex run inside apartment 4 at the 2005 Lakeshore building when Sanfillipo and Condor approached. Moore went to the apartment;

the front door was wide open. He knocked on the door and announced himself. There was no response, and he entered the apartment. Moore suspected that the men were trespassing or burglarizing the unit; he did not have any information that the men had been sleeping there.

Once inside the apartment, Moore observed feet protruding from a closet in one of the bedrooms. Moore ordered the person, in English, to come out, and Julio came forward. Moore handcuffed him and brought him to the living room. Defendant then came out of the bathroom, and Moore handcuffed him. There were no other individuals in the apartment. Moore explained that he handcuffed both men right away for safety reasons because he did not know who they were, he was there by himself with the two managers, and he had information that the men were trespassing.

While waiting for another officer to arrive, Moore asked the men for identification. Julio had a wallet on his person, and defendant nodded toward the bedroom and "indicated" that he had identification there. They walked to the bedroom, defendant "indicated" toward a box near a bed, and Moore found a wallet inside the box. Inside the wallet, Moore found a resident alien card that he later discovered was fraudulent, a document he suspected was a Mexican birth certificate, and a Social Security card. Moore suspected that the Social Security card was invalid, because the ink on it ran when it was moistened. Defendant told Moore that he lived in the apartment, but Moore understood from the managers that he did not.

As Moore waited for Officer Wilgus to arrive, Sergeant Mark Pollock arrived on the scene. Because Moore believed that he had probable cause that one or both of the suspects had committed trespass to land or trespass to the residence, Moore and Pollock transported the men to the public safety building. There, Moore arrested the men. Pollock contacted the place of business of Antonio

Ferral, the person who lived in the apartment, to inquire whether defendant and Julio were allowed to be in the apartment.

Pollock, a Belvidere police shift supervisor, testified that, on June 24, 2005, he went to the Courtyard Apartments after he learned that Moore and Wilgus had detained two suspects there. Pollock and Condor went to Northwest Pallet, Antonio's employer, to investigate whether he had granted defendant and Julio permission to be there. Antonio, defendant's paternal cousin, stated that both Julio and defendant had permission to be in the apartment. Moore testified that he discovered after the arrests that Antonio was the apartment tenant.

Antonio testified that, on June 24, 2005, he had a lease for apartment 4. After Antonio's divorce, defendant, who was already living at the apartment, had invited Antonio to live there; as of June 2005, Antonio had been living at the apartment for more than one year. Defendant, Julio, and Moises Ferral, who were all cousins, lived in the apartment. Antonio explained that the door to the apartment was working at this time, although there was a small problem with the locking mechanism. Antonio testified that defendant's name was on the lease. Antonio had his name added to the lease so that he could register his truck and obtain a parking sticker. According to Antonio, defendant paid everyone's rent on more than one occasion. Antonio later clarified that he did not know if his name was on the lease, but he verified that he registered his name with apartment management.

Defendant testified that, on June 24, 2005, he lived at apartment 4 at the Lakeshore building. He paid the June 2005 rent, but the manager did not put his name on the receipt. Defendant stated that he lived at the apartment for about one year. He conceded that, one day before he was arrested, Dammon told him that he was not supposed to be on the property. Defendant could not tell Dammon

in English that he lived at the apartment, although he tried to do so in Spanish. Defendant denied telling Parker in English that he lived in Elburn.

Condor testified that she is the leasing agent for Waterford Property Management, which owns the Courtyard Apartments. She also manages the apartments. Condor testified that Moises, defendant, and Alfonso Ferral (defendant's brother) had applied to be tenants at apartment 4 at 2005 Lakeshore, but only Moises and Alfonso were on the original lease, because defendant's application had been denied. The lease term was July 27, 2004, through August 31, 2005.[1] Through a "request for status change," the tenants had asked for Antonio to live with them. Antonio had the current lease for the apartment.

Condor stated that defendant was never allowed to live on the property or to be on the property. Condor explained that, as a result of several incidents involving defendant, he was barred from the property. Both Condor and Belvidere police officers had told defendant that he was "no longer" allowed on the property. In June 2005, defendant had thrown beer bottles across the apartment parking lot and had once kicked in a door. Also, twice before, Condor had defendant removed from the property. Before that, if defendant saw either Condor or "Joe" come on the property, he would get in a car and drive away.

Condor further testified that Antonio or Moises usually paid the rent. However, she could not recall who paid the June 2005 rent. She stated that defendant had never paid the rent. According to Condor, defendant speaks "perfect" English. Antonio and Moises do not speak English. Condor

---

[1]The lease document reflects that Moises and Alfonso were the original tenants for the 2004-05 lease term.

denied knowing that defendant was related to Antonio and Moises. In the past, defendant had provided Condor with different names, including his actual name.

Condor further testified that, on the morning of June 24, 2005, a woman who lives across from 2005 Lakeshore told Condor that someone was breaking into apartment 4. Condor saw defendant and Julio kicking in the apartment door. Condor and Sanfillipo went to the apartment. Once there, Condor saw defendant and Julio jumping out of a window. Condor further testified that apartment maintenance men restrained the intruders, and the police arrived. Condor told the police that defendant had broken into the apartment. She did not tell them that he had been sleeping there.[2] The door frame to the apartment was broken.

After reviewing defense exhibit No. 2, a purported lease agreement showing defendant as a tenant, Condor testified that it was an altered document because "2700 Lakeshore" had been crossed out and marked to be "2005 Lakeshore." Also, the document was not signed.

Defendant testified in rebuttal, upon reviewing defense exhibit No. 2, that he, Alfonso, and Moises rented the apartment because they had nowhere else to live. He conceded that his signature was not on the document but denied that Condor had rejected his rental application. According to defendant, they put Moises's name on the rental application because he was the only applicant who had at least one year's work experience. Condor informed them that they could rent the apartment. Defendant conceded that he "never signed any documents."

---

[2] The record does not reflect that Condor related to Moore before he entered apartment 4 that she observed defendant and Julio jumping out of the window or that maintenance workers had restrained them.

In denying defendant's motion to quash and suppress, the court noted that it was ruling based on "all the grounds argued by counsel." Defendant moved to reconsider. On November 17, 2006, the court denied the motion.

On May 29, 2007, the trial court conducted a stipulated bench trial. Following the court's admonishments to defendant, the State recited the evidence from the pretrial hearing. The State added that the police had contacted the Social Security Administration, which confirmed that the number on the card found in apartment 4 was not assigned to defendant. Also, the resident alien card did not have the watermark consistent with that of a valid resident alien card. Trial counsel stipulated to this, and the trial court entered convictions.

The trial court sentenced defendant to 2 years' conditional discharge, a $500 fine, and 14 days in jail with credit for 7 days served and with day-for-day credit. Defendant appeals.

## II. ANALYSIS

Defendant challenges on three different bases the trial court's denial of his motion to quash and suppress, arguing that this court should suppress the evidence derived from the unconstitutional search of apartment 4 and reverse his convictions. First, defendant argues that the police violated his fourth amendment rights by making a warrantless entry into a private residence where defendant was staying at the resident's invitation. Second, he asserts that, assuming the entry was constitutional, his custodial arrest was unconstitutional because the police lacked probable cause and there were no exigent circumstances. Third, defendant contends that, assuming his custodial arrest was constitutional, the police had neither probable cause nor any other justification to allow them to search inside the box where they located his identification cards.

In reviewing a ruling on a motion to suppress, a reviewing court will not disturb a trial court's findings of historical fact unless such findings are against the manifest weight of the evidence. People v. Pitman, 211 Ill. 2d 502, 512 (2004). We review de novo, however, the ultimate question whether the evidence should be suppressed. Pitman, 211 Ill. 2d at 512.

The fourth amendment to the United States Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV. Similarly, article I, section 6, of the Illinois Constitution provides that the "people shall have the right to be secure in their persons, houses, papers and other possessions against unreasonable searches [and] seizures." Ill. Const. 1970, art. I, §6. Article I, section 6, is interpreted in limited lockstep with the fourth amendment. People v. Caballes, 221 Ill. 2d 282, 313 (2006).

## A. Warrantless Entry

Defendant argues first that he had a reasonable right to privacy in the apartment and, thus, that Moore needed probable cause or something approximating probable cause to enter the apartment. See Pitman, 211 Ill. 2d at 514 ("to claim the protection of the fourth amendment, a defendant must demonstrate that he or she personally has an expectation of privacy in the place searched and that his or her expectation is reasonable"). Assuming, without deciding, that defendant may invoke the fourth amendment, we conclude that the police properly entered the apartment. Warrantless, nonconsensual entries into homes when police suspect burglaries in progress have been upheld: (1) under the emergency exception; or (2) upon a finding of probable cause and exigent circumstances. Further, exigent-circumstances case law utilizes two approaches: (1) finding that exigent circumstances are present if there is probable cause to believe that a burglary is in progress;

or (2) applying the multifactor test set forth in <u>Dorman v. United States</u>, 435 F.2d 385, 392-93 (D.C. Cir. 1970) (hereinafter <u>Dorman</u> factors). In his briefs to this court, defendant focuses on the <u>Dorman</u> factors. We conclude below that the emergency exception is dispositive, but we also assess the police entry by reviewing exigent-circumstances case law. Thus, we hold below that, under any of the foregoing approaches, the police properly entered apartment 4.

### 1. Emergency Exception

Under the emergency exception, "[n]o warrant is necessary when police enter into and search the premises with a reasonable belief that immediate action is necessary for the purpose of providing aid to persons or property in need thereof." <u>People v. Griffin</u>, 158 Ill. App. 3d 46, 50 (1987); see also <u>Mincey v. Arizona</u>, 437 U.S. 385, 392, 57 L. Ed. 2d 290, 299-300, 98 S. Ct. 2408, 2413 (1978); <u>People v. Smith</u>, 47 Ill. 2d 161, 164-65 (1970) (preservation of human life paramount to right of privacy in such cases); <u>People v. Brooks</u>, 7 Ill. App. 3d 767, 775-76 (1972). Under the emergency exception: (1) the police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance in the protection of life or property; and (2) there must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be entered and searched. <u>Griffin</u>, 158 Ill. App. 3d at 50-51; see also <u>United States v. Snipe</u>, 515 F.3d 947, 951 (9th Cir. 2008).[3] The reasonableness of the officer's belief concerning the

---

[3]A third prong, that the "search must not be primarily motivated by intent to arrest and seize evidence" (<u>Griffin</u>, 158 Ill. App. 3d at 51), was invalidated by the Supreme Court in <u>Brigham City, Utah v. Stuart</u>, 547 U.S. 398, 404-05, 164 L. Ed. 2d 650, 658, 126 S. Ct. 1943, 1948 (2006) (under the fourth amendment, reasonableness is judged independently of the state of mind of the officer; thus, police entry in response to apparent assault that left one person bloodied not judged by whether

existence of an emergency is determined by the entirety of the circumstances known to the officer at the time of entry. Griffin, 158 Ill. App. 3d at 51. If the entry was valid under these considerations, then evidence of crime discovered during the entry may be legally seized without a warrant. Griffin, 158 Ill. App. 3d at 51.

As to the first prong of the emergency exception, we conclude that Moore had reasonable grounds to believe that there was an emergency--a suspected burglary--at hand at apartment 4 and an immediate need for his assistance for the protection of life or property. Condor testified that a woman who lives across from apartment 4 told her on the morning of June 24, 2005, that someone was breaking into the unit. Condor saw defendant and Julio kicking in the apartment door, and she testified that the door frame was broken. Moore testified that Dammon told him that two individuals were trespassing at the apartment. Condor and Sanfillipo informed Moore that the two individuals were banned from the complex. Condor further told Moore that defendant broke into the apartment. Moore testified that, when he arrived at apartment 4, the door was wide open and he suspected that defendant and Julio were inside the unit, trespassing and possibly burglarizing the apartment. Based on this evidence, Moore had reasonable grounds to believe that there was an emergency at hand and that there was an immediate need for his assistance to protect life or property. We further conclude that the second prong of the emergency exception--a reasonable basis, approximating probable cause, to associate the emergency with the place to be entered--is met because, as we explain below, Moore

---

police subjectively intended to effect an arrest, but by whether there was an objectively reasonable basis to believe someone was in need of aid). Our supreme court, which takes a limited lockstep approach, has expressly followed Brigham City's rejection of a subjectivist approach to fourth amendment issues. People v. Wear, 229 Ill. 2d 545, 566 (2008).

had actual probable cause to enter the apartment. Thus, under the emergency exception, Moore's entry was proper.

### 2. Probable Cause and Exigent Circumstances

Although we find the emergency exception dispositive of the issue of Moore's warrantless, nonconsensual entry, we assess exigent-circumstances case law below because defendant focuses in his briefs on that analytical framework. We begin by determining whether there was probable cause for Moore to enter the apartment.

### a. Probable Cause

"A search conducted without a search warrant is per se unreasonable unless it is a search conducted pursuant to consent, a search incident to arrest, or a search predicated upon probable cause where there are exigent circumstances which make it impractical to obtain a warrant." People v. Alexander, 272 Ill. App. 3d 698, 704 (1995). "Probable cause exists when the totality of the facts and circumstances known to the officers is such that a reasonably prudent person would believe that the suspect is committing or has committed a crime." People v. Montgomery, 112 Ill. 2d 517, 525 (1986). The existence of probable cause depends upon the totality of the circumstances at the time of the entry. People v. Love, 199 Ill. 2d 269, 279 (2002). " 'The standard for determining whether probable cause is present is probability of criminal activity, rather than proof beyond a reasonable doubt. [Citations.]' " People v. Garvin, 219 Ill. 2d 104, 115 (2006), quoting People v. Lee, 214 Ill. 2d 476, 485 (2005). Probable cause does not demand a showing that the belief that the suspect has committed a crime be more likely true than false. People v. Jones, 215 Ill. 2d 261, 277 (2005).

Defendant asserts that, in light of the minimal police investigation and the witness-credibility issues, the police here lacked probable cause to enter the apartment. He argues that Moore never saw

him doing anything unusual. Defendant further argues that Moore could have spoken to Antonio before entering and that, if he had done so, he would have learned that defendant was present with Antonio's permission. Defendant also attacks Condor's credibility, asserting that she was unreliable because she stated that her maintenance workers had restrained defendant and were holding him outside the apartment after defendant and Julio broke into the unit; however, the maintenance workers did not testify at the hearing on defendant's motion and none of the police officers testified that they were told that the apartment employees had detained defendant.[4] Defendant concludes that probable cause was not shown by this incredible testimony. Defendant urges that this is significant because, according to Condor, the defendant was outside the apartment and thus in a place where he had no reasonable expectation of privacy. Instead, police found him inside the apartment, where, defendant urges, he had every expectation of privacy. Defendant further asserts that prior to the entry there was no investigation beyond Condor's statements. Given Condor's motive to be less than truthful--she twice previously had defendant removed from the property and may have wanted to save her company money by avoiding litigating an eviction claim--the police should have independently verified that defendant was not supposed to be in apartment 4. Finally, defendant attacks Dammon's credibility, arguing that, as an apartment employee, he had a motive to testify in line with the company's interests and to see that his orders that defendant stay away from the property were followed.

We conclude that there was probable cause for the police to enter apartment 4. Condor testified that, on June 24, 2005, a woman who lives across from 2005 Lakeshore told her that someone was breaking into apartment 4. Condor stated that she saw defendant and Julio kicking in

---

[4]At oral argument, neither party could explain Condor's statements.

the apartment door and that defendant was barred from the property. Condor further testified that she and Sanfillipo went to the unit and saw defendant and Julio jumping out of a window. Condor stated that she told police that defendant had broken into the unit. Dammon testified that Condor contacted him on June 24, 2005, stating that defendant was on the property and that a door had been kicked in at apartment 4. Dammon then contacted Moore and asked him to go to the property. Moore testified that he knew from both Dammon and Parker that they had instructed defendant to stay away from the apartment complex. Parker testified that the day before defendant's arrest, defendant told Parker that he lived in Elburn. Moore testified that, when he met with Condor and Sanfillipo, they informed him that, earlier that day, they had seen two men who were barred from the complex run inside apartment 4. When he arrived at the unit, Moore observed that the unit's front door was open. He knocked and announced himself and then entered the apartment. Moore believed that he had probable cause that one or both of the men had committed a crime, at least trespass to land or residence, and he arrested them. Based on this evidence, we conclude that the facts known to Moore at the time of his entry into the apartment were sufficient to lead a reasonably cautious person to believe that defendant had committed a crime.

Turning to the extent of the police investigation, we reject defendant's argument that the police should have more thoroughly investigated the nature of defendant's presence in the apartment. Moore learned from several sources--Dammon, Parker, and Condor--that defendant and Julio were banned from the complex. Further, Moore received information from Parker and the managers that the suspects did not live at the complex. Also, Condor told police that defendant and Julio had broken into apartment 4 that day, and Dammon testified that, when Condor contacted him concerning the suspects, she noted that the door to apartment 4 had been kicked in.

As to Condor's credibility, we cannot conclude that her testimony was inherently unbelievable. Although Moore located defendant and Julio inside the unit, Condor testified that she and Sanfillipo saw the suspects kicking in the apartment door and, later, jumping out a window, and that they were then restrained by maintenance workers. It is unclear from her testimony whether she intended to state that the suspects remained outside the apartment until the police arrived. Nevertheless, there was no testimony that she related the window-jumping episode or the maintenance workers' involvement to Moore prior to his entry into the unit. In all other significant respects, her testimony was consistent with what the police related that Condor related to them. As to Dammon's credibility, defendant does not specify what part of his testimony was incredible, nor does he point to any evidence reflecting any bias on Dammon's part other than that he worked at the apartment complex while off-duty. In sum, we reject defendant's argument that the police lacked probable cause to enter the apartment.

### b. Exigent Circumstances

Next, defendant argues that, even if the police had probable cause, they failed to show that there were exigent circumstances justifying their warrantless, nonconsensual entry into apartment 4. "Generally, a warrantless and nonconsensual entry into a suspect's home to make an arrest is prohibited by the fourth amendment, even with probable cause." People v. Wear, 229 Ill. 2d 545, 567 (2008). "In the absence of consent or exigent circumstances, the police are prohibited from making a warrantless entry into a private residence to effectuate a routine felony arrest." People v. Williams, 161 Ill. 2d 1, 25-26 (1994); see also Payton v. New York, 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371 (1980) (suspect should not be arrested in his house without an arrest warrant, even though there is probable cause to arrest him). This is because:

" '[t]o be arrested in the home involves not only the invasion attendant to all arrests but also an invasion of the sanctity of the home. This is simply too substantial an invasion to allow without a warrant, at least in the absence of exigent circumstances, even when it is accomplished under statutory authority and when probable cause is clearly present.' " Payton, 445 U.S. at 588-89, 63 L. Ed. 2d at 652, 100 S. Ct. at 1381, quoting United States v. Reed, 572 F.2d 412, 423 (2d Cir. 1978).

See also People v. Foskey, 136 Ill. 2d 66, 75 (1990) (requiring probable cause and exigent circumstances before an officer may make a warrantless arrest inside a home). The question of whether there were exigent circumstances, like the determination of probable cause, is judged according to the totality of the circumstances. People v. Tillman, 355 Ill. App. 3d 194, 198 (2005).

As we noted above, exigent-circumstances case law utilizes two approaches in analyzing burglary scenarios. The first approach concludes that exigent circumstances are present if there is probable cause to believe that a burglary is in progress.[5] The second approach utilizes the Dorman factors.

As to the first approach, many courts have upheld warrantless searches upon a finding of probable cause to believe that a burglary was in progress. See, e.g., United States v. Brown, 449 F.3d 741, 748 (6th Cir. 2006) ("This and other circuits have held that an officer may lawfully enter a residence without a warrant under the exigent circumstances exception when the officer reasonably believes a burglary is in progress"); In re Sealed Case 96-3167, 153 F.3d 759, 766 (D.C. Cir. 1998)

---

[5]This analysis is similar to the emergency exception. However, unlike the emergency exception, exigent-circumstances case law clearly requires probable cause and not some approximation thereof.

("probable cause to believe a burglary is in progress constitutes exigent circumstances sufficient to permit warrantless entry" and citing cases holding same); United States v. Reed, 141 F.3d 644, 649 (6th Cir. 1998) ("One exception [to the warrant requirement] allows police to enter a residence without a warrant if there is probable cause to believe there is a burglary in progress"); Reardon v. Wroan, 811 F.2d 1025, 1029-30 (7th Cir. 1987). "The need to prevent such a confrontation, by intercepting the burglar before he potentially confronts (or is confronted by) an occupant, is surely an exigent circumstance." In re Sealed Case, 153 F.3d at 767. Based on the foregoing authority, our finding that the police had probable cause to believe that a burglary was in progress is sufficient here, viewing the totality of the circumstances, to conclude that there were exigent circumstances justifying Moore's warrantless, nonconsensual entry. As we noted above, Moore had reasonable grounds to believe that a burglary was in progress and that there was an immediate need for his assistance.

Although the foregoing authority holds that probable cause to believe that a burglary is in progress is sufficient to find exigent circumstances justifying the police's warrantless, nonconsensual entry, defendant urges us to assess Moore's actions by applying the Dorman factors. The Dorman factors are utilized to assess whether exigent circumstances were present in cases involving serious crimes and a reasonable probability of imminent danger to life, serious damage to property, destruction of evidence, or the likelihood of flight. See People v. Yates, 98 Ill. 2d 502, 516 (1983). The Dorman factors include whether: (1) the crime under investigation was recently committed; (2) there was any deliberate or unjustified delay by the police during which time a warrant could have been obtained; (3) a grave offense was involved, particularly a crime of violence; (4) there was reasonable belief that the suspect was armed; (5) the police officers were acting on a clear showing

of probable cause; (6) there was a likelihood that the suspect would escape if he or she was not swiftly apprehended; (7) there was strong reason to believe that the suspect was on the premises; and (8) the police entry was made peaceably, albeit nonconsensually. Williams, 161 Ill. 2d at 26; Yates, 98 Ill. 2d at 516, citing Dorman, 435 F.2d at 392-93. The foregoing list is not exhaustive, and the fundamental guiding principle is reasonableness. Williams, 161 Ill. 2d at 26. In determining whether the police acted reasonably, we look to the totality of the circumstances confronting the officers at the time the entry was made. Williams, 161 Ill. 2d at 26.[6]

Defendant argues that, even if there was probable cause, Moore's warrantless entry into the apartment was made in the absence of exigent circumstances. He asserts that the police had sufficient time to secure a warrant; that this case did not involve a grave offense, such as murder, armed robbery, or assault; that the police could not have reasonably believed that defendant was armed; that there was not a clear showing of probable cause because Condor was not credible; and that there was no showing of any danger that defendant would escape if not immediately apprehended. Defendant contends that, at most, the offense was recently committed and Moore made his entry peaceably. However, he asserts that these factors are insufficient to establish exigent circumstances.

---

[6]The Dorman framework lends itself to emergency-type fact patterns. See Yates, 98 Ill. 2d at 516 ("exigent circumstances may exist where there is only a serious crime coupled with a reasonable possibility of imminent danger to life, serious damage to property, destruction of evidence, or the likelihood of flight"). In this respect, the first exigent-circumstances approach we discussed above is arguably an application of the Dorman factors to an emergency situation.

We disagree with defendant's reading of the evidence. As to the first Dorman factor, which defendant concedes, there was evidence here that a crime had been recently committed. Condor testified that a woman who lives across from apartment 4 told her on the morning of June 24, 2005, that someone was breaking into the unit. Condor saw defendant and Julio kicking in the apartment door, and she later saw defendant and Julio jumping out of a window. The door frame, according to Condor, was broken. As to the second factor--whether there was a deliberate or unjustified delay in obtaining a warrant--we disagree with defendant that there was no showing that there was insufficient time to obtain a warrant. Moore testified that he was concerned that defendant and Julio were trespassing and possibly burglarizing the apartment. Given the nature of the crimes that he suspected were being committed, we do not believe there was an unjustified delay by the police, during which time a warrant could have been obtained. As to the third and fourth factors, that a grave offense was involved and that the suspect was armed, we agree with defendant that those factors were not present here. There was no evidence that defendant or Julio was armed, and burglary--the most serious offense Moore suspected might be occurring in the unit--does not constitute a grave offense (see People v. Trull, 64 Ill. App. 3d 385, 390 (1978)). As to the fifth factor, we determined above that the police were acting on a clear showing of probable cause. As to the sixth factor, likelihood of escape, we believe that this factor was present, given the nature of the crimes that Moore suspected were being committed in the apartment, specifically trespass and burglary. The suspects were unlikely to remain on the premises if they were committing either of these offenses. Although there was some evidence that defendant had lived at the apartment, the evidence also showed that he was banned from the complex and that he had to break into the unit on June 24, 2005, rather than use a key to enter it. This evidence leans toward a showing that

defendant did not intend to stay in the unit for long. Furthermore, the door was wide open when Moore approached it, leading to an inference of haste. The seventh factor, belief that the suspect is on the premises, was shown here, where Condor testified that she observed defendant and Julio breaking into the unit. Finally, as to the eighth factor, that the police entered peaceably, defendant concedes this point and the evidence supports this inference. Moore testified that, when he approached the apartment, the door was wide open. He further testified that he knocked and announced his presence before he walked inside.

Viewing the totality of the circumstances, we conclude that Moore acted reasonably in entering apartment 4 and that there was an exigency to do so. Dammon testified that, on June 24, 2005, Condor called him and told him that defendant was at the unit and that the door to the apartment had been kicked in. Moore testified that Dammon told him that two individuals were trespassing at the apartment. Condor and Sanfillipo informed Moore that the two individuals were banned from the complex. Condor further informed Moore that defendant broke into the apartment. When Moore arrived at apartment 4, the door was wide open and he suspected that there were persons inside the unit who were trespassing or burglarizing the apartment. This evidence supports a finding of exigent circumstances.

Defendant's reliance on People v. Day, 165 Ill. App. 3d 266 (1988), is misplaced. In Day, State Police agents were conducting an undercover drug buy. At a residence in Normal, undercover agent Schappaugh met two individuals from whom she was going to purchase the drugs. The three drove to an apartment. One of the individuals, Gagliano, exited the van and went inside the apartment. He emerged a short time later and returned to the van. Shortly after they drove away, Schappaugh's vehicle was stopped, and a quantity of cannabis was recovered. The two individuals

were taken into custody, whereupon Gagliano told another agent that he got the cannabis from the defendant, who was a student. He also informed the agent that he had never seen a firearm at the defendant's apartment.

The agent and several surveillance team members returned to the apartment with Gagliano. Gagliano pointed out to them the exact apartment he had entered. One agent positioned himself at the rear of the residence, and three others went to the front. Two inspectors who were not in uniform knocked on the front door, and the defendant answered. The testimony conflicted as to whether one of the inspectors identified himself as a police officer. He asked if anyone else was in the home, and the defendant answered that his roommate was upstairs. The defendant then stepped aside. The inspectors went upstairs to get the roommate, and one of the officers let inside the agent who was positioned by the rear door. The agent gave the defendant and his roommate a consent-to-search form, and they signed it. He also read them their Miranda rights.

The defendant appealed from the denial of his motion to suppress evidence based on the warrantless entry of the police into his home. The court held that there was no exigency that justified the warrantless entry. Day, 165 Ill. App. 3d at 268. The court noted that, although the defendant's arrest took place almost immediately after the crime, there was no need for prompt police action, because the defendant was unaware of the events that had transpired; thus, his immediate apprehension likely was not necessary to prevent flight or the destruction of evidence. Day, 165 Ill. App. 3d at 268. Further, the defendant was not suspected of a crime of violence and there was no evidence showing that he was armed or dangerous. Day, 165 Ill. App. 3d at 268. The court determined that the only factors in the State's favor were that the officers acted quickly, that they had good cause to believe the defendant was on the premises, and that their entry was peaceable. Day,

165 Ill. App. 3d at 268-69. "To hold these factors alone sufficient to justify a warrantless entry and arrest would all but emasculate the protection afforded by the fourth amendment." Day, 165 Ill. App. 3d at 269.

The court also rejected the State's argument that the consent form provided an independent source for the evidence disclosed in the search. Day, 165 Ill. App. 3d at 269. The court held that the defendant's consent was not obtained until the officers had already made the illegal entry and that "such consent is not sufficiently attenuated from the illegality as to remove the taint." Day, 165 Ill. App. 3d at 269.

We find defendant's reliance on Day to be misplaced because the Day defendant was unaware of the undercover activities that had transpired and the court concluded that his immediate apprehension was not necessary to prevent flight or the destruction of evidence (Day, 165 Ill. App. 3d at 268). Here, Condor testified that she and the woman who lived across from apartment 4 had observed defendant and Julio breaking into the unit. Further, Condor testified that, on two prior occasions, she had defendant removed from the property and that defendant would get in a car and drive away when he saw the managers. Thus, defendant was aware on June 24, 2005, that apartment management objected to his presence on the property, and he had a history of run-ins with management wherein he would drive away when he saw them. In contrast to Day, the factors here show that defendant's immediate apprehension was necessary to prevent his flight.

In summary, we conclude that, assuming defendant had an expectation of privacy in the apartment and, therefore, may invoke the fourth amendment, the evidence supported a finding that Moore had reasonable grounds to believe that there was an emergency--a suspected burglary--at hand and an immediate need for his assistance for the protection of life or property, along with a

reasonable basis (here, actual probable cause) to associate the emergency with the apartment. Although the application of the emergency exception is dispositive, we also conclude that the evidence supported a finding of probable cause and exigent circumstances (based either solely on the basis that there was probable cause to believe that a burglary was in progress or on the basis that there were both probable cause and exigent circumstances pursuant to Dorman).

### B. Custodial Arrest

Defendant argues second that, even if the police lawfully entered the apartment, they had no probable cause to arrest him. To make a constitutionally valid warrantless arrest, a police officer must have probable cause to effect the arrest. Love, 199 Ill. 2d at 278. Probable cause to arrest exists when the facts known to the officer at the time of the arrest are sufficient to lead a reasonably cautious person to believe that the arrestee has committed a crime. Love, 199 Ill. 2d at 279. As we noted above, the existence of probable cause depends upon the totality of the circumstances at the time of the arrest. Love, 199 Ill. 2d at 279. Although the standard requires more than mere suspicion, it does not require that at the time of the arrest the police have evidence sufficient to convict the defendant. People v. Moody, 94 Ill. 2d 1, 7 (1983). Courts must remain cognizant of the observation that the police " 'often must act upon a quick appraisal of the data before them, and the reasonableness of their conduct must be judged on the basis of their responsibility to prevent crime and to catch criminals.' " People v. Jones, 31 Ill. 2d 42, 47 (1964), quoting People v. Watkins, 19 Ill. 2d 11, 19 (1960). In determining the validity of a warrantless arrest, our review necessarily focuses on the information available to the police before the arrest. People v. Belton, 257 Ill. App. 3d 1, 6 (1993).

Here, defendant argues that Moore had no probable cause to arrest him. He asserts that, although Moore testified that he suspected defendant had committed burglary or trespass to residence, Pollock had learned by the time defendant was arrested that Antonio had invited defendant to live at the apartment and that Antonio was the leaseholder. Defendant also challenges Moore's testimony on the basis that it came from "self-serving informants with a motive to falsify information." Further, defendant also takes issue with his arrest on the basis that Moore did not observe or encounter facts and circumstances such that he could reasonably believe that defendant was committing an offense. Defendant notes that Moore first saw Julio's feet protruding from the closet, and he handcuffed Julio. Subsequently, Moore saw defendant emerge from the bathroom, and he handcuffed defendant. Assuming that the handcuffing effected an arrest, defendant urges that mere proximity to another is an insufficient ground upon which to arrest. He notes that Moore never stated that he had a description of the alleged intruders; he never stated that defendant acted suspiciously or attempted to flee; he never had defendant step outside so that the managers could identify him; and he never asked Antonio if defendant was permitted to be there. Defendant argues that, absent such an investigation, Moore merely had the self-serving statements of the apartment employees, which were insufficient to establish probable cause.

We conclude that the facts known to Moore at the time he handcuffed defendant were sufficient to have led a reasonably cautious person to believe that defendant had committed a crime. At that time, Moore knew from Dammon that the apartment manager had complained that the apartment door had been kicked in. Both Dammon and Parker told Moore that defendant had been banned from the complex and did not live there. At the complex, Condor told Moore that defendant had been banned from the property and that he and the other individual were trespassing. At the unit,

Moore found the door open. Condor told him that defendant and his companion had run inside after breaking into the unit. Moore stated that he suspected that the people inside the apartment were trespassing or burglarizing the apartment. Once inside, Moore observed Julio's feet protruding from a closet and did not initially observe defendant, facts from which it was reasonable to assume that the men were trying to escape detection. Moore formally arrested defendant before Antonio informed police that defendant had permission to be in the unit. Based on this evidence, Moore had probable cause to arrest defendant for trespass or burglary.

## C. Search of Box

Defendant's final argument is that, even if the police had probable cause to arrest him, they did not have probable cause or any other basis to search the box where he kept his wallet and identification. We conclude that defendant forfeited this argument.

As the State notes in its brief, defendant did not raise the issue in the trial court in either his motion to quash and suppress or his motion to reconsider. A defendant forfeits an issue for purposes of appeal where he or she fails to raise it through both an objection and a posttrial motion. People v. Robinson, 167 Ill. 2d 397, 404 (1995). Furthermore, in his briefs to this court, defendant does not address his failure to raise the search issue in the trial court and he does not ask this court to review the issue for plain error. Indeed, defendant does not at all address the forfeiture argument. We conclude that defendant forfeited the search issue. See 210 Ill. 2d Rs. 341(h)(7) (points not argued are waived), 612(i); People v. Nieves, 192 Ill. 2d 487, 503 (2000).

## III. CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Boone County is affirmed.

Affirmed.

SCHOSTOK, J., concurs.

JUSTICE O'MALLEY, specially concurring:

I agree with the majority that it was reasonable for the police to enter apartment 4, canvass it, and arrest defendant, all without a warrant. This case presents a straightforward application of what the majority recognizes as the "emergency" exception. Officer Moore's reasonable belief that a burglary, with all its attendant dangers, was occurring in apartment 4 sufficed by itself to justify his warrantless entry into the apartment. So the majority concludes early on. Slip op. at 9-11. This should have ended the matter, but the majority goes on to apply the Dorman test, which is inapposite to an emergency situation posed by an ongoing crime presenting an immediate threat to persons or property.

The Dorman "exigency" exception and the "emergency" exception are both outgrowths of the principle that a warrantless entry for search, seizure, or arrest is permissible where " 'the inevitable delay incident to obtaining a warrant must give way to an urgent need for immediate action.' " United States v. Santa, 236 F.3d 662, 669 (11th Cir. 2000), quoting United States v. Burgos, 720 F.2d 1520, 1526 (11th Cir. 1983). Each exception, however, serves a distinct value:

"The 'emergency' exception stems from the police officers' 'community caretaking function' and allows them 'to respond to emergency situations' that threaten life or limb; this exception does 'not [derive from] police officers' function as criminal investigators.' [Citation.] By contrast, the 'exigency' exception does derive from the police officers' investigatory function; it allows them to enter a home without a warrant if they have both probable cause to believe that a crime has been or is being committed and a reasonable belief that their entry is 'necessary to prevent *** the destruction of relevant evidence, the escape of the suspect, or

some other consequence improperly frustrating legitimate law enforcement efforts.' [Citation.]" (Emphasis in original.) Hopkins v. Bonvicino, 573 F.3d 752, 763 (9th Cir. 2009).

In Dorman:

"The issue [was] whether the police acted unreasonably, and in violation of constitutional rights, when they proceeded, in furtherance of their objective to arrest a suspect they had probable cause to believe was an armed felon, to make a warrantless, unconsented, non-forcible entry into his home late in the evening, at a time some few hours after the offense and within an hour after they obtained eyewitness identification of the suspect, and when a magistrate was not readily available." Dorman, 435 F.2d at 388.

Dorman crafted its factors as aids in determining whether exigency exists "where the entry is for the purpose of making an arrest of a suspected felon." Dorman, 435 F.2d at 390. The factors thus have been used to elaborate the decree in Payton v. New York, 445 U.S. 573, 576, 590, 63 L. Ed. 2d 639, 644, 653, 100 S. Ct. 1371, 1374, 1382 (1980), that the fourth amendment "prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest," i.e., that "[a]bsent exigent circumstances [or consent], [the] threshold [of the home] may not reasonably be crossed without a warrant." (Emphasis added.) See People v. Abney, 81 Ill. 2d 159, 168 (1980) (noting that Payton did not attempt to define exigent circumstances but finding guidance in Dorman). Illinois courts have continued to apply the Dorman factors in judging "exigency in circumstances involving warrantless entry into a private residence to effectuate an arrest." People v. McNeal, 175 Ill. 2d 335, 345 (1997).

The <u>Dorman</u> test is a poor fit for emergency scenarios that involve ongoing crime, because the test presupposes a completed crime. <u>Dorman</u>'s first factor is whether "the crime under investigation was <u>recently</u> committed" (emphasis added) (<u>Williams</u>, 161 Ill. 2d at 26), not whether the crime was simply complete. See 3 W. LaFave, Search & Seizure §6.6, at 450-51 (4th ed. 2004) (noting that <u>Payton</u> and its progeny are "concerned with the entry of private [property] by police for the purpose of arresting a person thought to be within or for the purpose of finding the fruits, instrumentalities or evidence of some <u>past crime</u>" and noting that "clearly police have occasion to enter premises without a warrant for a variety of other purposes" (emphasis added)). The <u>Dorman</u> factors attempt to strike a balance between two governmental and societal interests: maintaining the sanctity of the dwelling and apprehending with all due swiftness a suspect believed to be within that dwelling. The concern for the integrity of the home is perhaps most explicit in the factor of whether "the police entry was made peaceably, albeit nonconsensually" (<u>Williams</u>, 161 Ill. 2d at 27).

Where, however, there is <u>ongoing</u> crime that supports "a reasonable belief that immediate action is necessary for the purpose of providing aid to persons or property in need thereof" (<u>People v. Griffin</u>, 158 Ill. App. 3d 46, 50 (1987)), the analysis is radically simplified. The emergency exception shows no overt concern for the privacy of the place to be entered; that interest is overridden by the urgency posed, subject to the requirement of "some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched" (<u>Griffin</u>, 158 Ill. App. 3d at 51). See <u>United States v. Snipe</u>, 515 F.3d 947, 952 n.6 (9th Cir. 2008) (refusing to incorporate <u>Dorman</u> factor of "gravity of the underlying offense" into the emergency exception because it would lead officers to weigh the degree of the emergency while deciding whether to obtain a warrant, and hence would dangerously slow response time); <u>State v. Barboza</u>,

57 Wash. App. 822, 830, 790 P.2d 647, 651 (1990) (Dorman not applicable because its factors "apply to entries made to effect an arrest, such as in a situation of 'hot pursuit,' " but the case at hand "involve[d] entry made to rescue any injured persons and for the safety of the public and police").

The majority not only applies the inapposite Dorman factors but makes a finding under the factors that is in tension with its prior conclusions under the emergency exception. In applying the emergency exception, the majority concluded that Moore's belief that "a suspected burglary" was occurring in apartment 4 gave him cause to believe "there was an immediate need for his assistance for the protection of life or property" and permitted him to enter without a warrant. Slip op. at 10. Under the Dorman factors, however, the majority finds that "burglary--the most serious offense Moore suspected might be occurring in the unit--does not constitute a grave offense." Slip op. at 18. I fail to see how an ongoing burglary could suffice, without more, to allow warrantless entry to a dwelling yet not be a "grave offense."

This tension becomes more prominent given the majority's belief that there are two distinct exigency tests. "The first approach concludes that exigent circumstances are present if there is probable cause to believe that a burglary is in progress," while "[t]he second approach utilizes the Dorman factors." Slip op. at 15. Hence for the majority, an ongoing burglary is not a "grave offense" under one exigency test, yet, under another exigency test, it is sufficient in itself to permit a warrantless entry. If the case law does indeed reach such divergent conclusions, the majority ought to choose a side rather than adopt that dichotomy into its analysis. Better yet, the majority should have been content to apply the emergency exception alone.